### LONG–BELL LUMBER CO. v. STUMP et al.

(Circuit Court of Appeals, Eighth Circuit. March 21, 1898.)

No. 1,006.

1. TRIAL—PROVINCE OF COURT—ACCOUNTS STATED.

Where accounts are rendered monthly, through a period of more than two years, without objection, the question whether notice of objection was within a reasonable time is wholly one of law, for the court, and should not be submitted to the jury.

2. SAME—EXCEPTIONS.

Where a party requests the court to give a proper declaration of the law to the jury, which the court refuses to do, to which refusal exception is taken, and the court then declares the law to be otherwise, it is not necessary to again except to this latter declaration.

3. CONSTRUCTION OF CONTRACT.

Where a contract is wanting in perspicuity or clearness of meaning, there is no better rule than to adopt the construction put upon it by the parties before any controversy arose.

4. SAME—GRADING LUMBER.

Where a contract provided that lumber was to be "subject to the grades adopted by the Southern Lumber Manufacturers' Association," but did not

specify by whom the grading was to be done, the reasonable inference is that both parties are to participate.

5. SAME.

Where a contract provided for the grading of lumber, but did not say by whom it should be graded, and, during the whole period of dealings, after the lumber reached its destination it was graded by the purchaser, and accounts of shipments and gradings were sent monthly to the vendor, with acceptances, which he accepted, in a suit in which the issue was whether the lumber contained culls it was error to charge the jury that when the vendor, at his mill, delivered the lumber to the agent of the purchaser, and the agent received the lumber, and furnished a statement to the vendor, the lumber at the mill became the property of the purchaser, and was received by him as merchantable lumber.

6. ESTOPPEL.—STATED ACCOUNTS.

Where for a number of years the purchaser rendered monthly accounts of lumber received, giving the date, quantity, and grading, and the amount due thereon, with acceptances, which the vendor cashed or negotiated without notifying the purchaser of his dissatisfaction with the grading, the vendor is estopped from impeaching the stated accounts, except for fraud or mistake.

Thayer, Circuit Judge, dissenting.

In Error to the Circuit Court of the United States for the Western District of Arkansas.

The Petross-Stump Lumber Company is a voluntary association conducting in the state of Arkansas and the Indian Territory the business of manufacturing and selling lumber. The Long-Bell Lumber Company is a Missouri corporation, with its principal business office at Kansas City, Mo., with an agency at Van Buren, Ark., where the lumber in question was principally shipped after having been milled. On the 17th day of November, 1893, these companies entered into the following contract:

"Memorandum of agreement made this, the 17th day of November, 1893, between the Petross-Stump Lumber Company, of Tuskahoma, I. T., and the Long-Bell Company, of Kansas City, Mo., witnesseth: The said Petross-Stump Lumber Company agree to sell all the merchantable lumber manufactured by their mill now located at Tuskahoma, I. T., or any other mill or mills they may erect or operate during the year 1894, at the following prices, per Exhibit A, hereto attached, and made a part of this agreement. All shipments and grades to be subject to grades adopted by the Southern Lumber Manufacturers' Association. The said Petross-Stump Lumber Company agree to cut all lumber of such lengths and of such thickness and widths as the said company may direct, and to cut all stock plump, as to length, width, and thickness, and to insure all lumber in stack at the end of each month in favor of said company, and pay the premium on the same. And in consideration of the above the said company agrees to take an inventory of all the lumber in stack at the mill of the said Petross-Stump Lumber Co. between the 1st and 10th of each month during this contract, and the said Petross-Stump Lumber Co. will, after said inventory, turn over to the agent of the said company all of the said lumber so mentioned, which was to become the property of the said company, and for which the agent of the said company will render a statement to the said Petross-Stump Lumber Co. for all lumber received from them. The said company further agrees to advance $5 per thousand for all lumber checked up each month, in 120-day acceptances; reserving the right to discount the same at 4 per cent., and pay the remainder when the stock is shipped out on the same terms. No advance will be made on star and clear, but all shipments made during the month will be paid for in full between the 1st and 10th of the following month, as per terms specified above,—120-day acceptances. And it is expressly understood and mutually agreed upon that the company is under no obligation, by reason of taking the entire output of the mill, to accept any lumber that will not meet the requirements of the grades referred to. This contract is to continue in force until Jan. 1st, 1894."

Shipments of lumber under this contract were made to the Long-Bell Company (hereinafter called the "defendant"), by the Petross-Stump Lumber Company

(hereinafter called the "plaintiff"), up to the 9th day of January, 1895, at which time the plaintiff assigned said contract to the Bank of Springdale, Ark., when it sent to the defendant the following notice thereof:

                                        "Tuskahoma, I. T., Jan. 9th, 1895.

"Long-Bell Lumber Co.—Gentlemen: Pay to the Bank of Springdale, Arkansas, any and all sums of money now due, or which may hereafter become due, from you under the agreement and contract existing between yourself and the undersigned; we having this day sold and assigned to the said the Bank of Springdale all our right and title, claim and interest, in and to all accounts and claims and interest, in and to all accounts and claims in our favor, and against you, for any and all lumber now being held by us for your account under said agreement.

"Respectfully,                    Petross-Stump Lumber Co.   L. S. P."

Up to the time of this assignment, monthly statements of such shipments, showing dates, quantity, quality, and grade, as also cost price during the current month, accompanied with defendant's check for the amount of each month's dues, were regularly sent by the defendant to the plaintiff. And after the assignment the shipments were continued as theretofore up to the last consignment, in January, 1896, and monthly statements and remittances as aforesaid were sent to the bank. Thus matters stood until this action was instituted by the plaintiff in June, 1896, claiming a balance on account of $2,413.44. The answer, inter alia, pleaded that by reason of the assignment the plaintiff is not the real party in interest. It denied that the exhibit filed with the petition as a part of said contract was either the original, or a copy thereof; and defendant filed with its answer what is claimed to be a correct copy. It also pleaded that all the lumber shipped by plaintiff was not merchantable lumber, as called for by the contract. It then specifically pleaded the facts aforesaid respecting the rendering of monthly accounts,—that each monthly stated account was closed up and settled by them at the time, and that by its acceptance thereof, as also its assignee, the bank, without objection or protest, the plaintiff is estopped from reopening the account and maintaining this action. The reply only put in issue—First, the allegation of the answer respecting the assignment of the contract to the bank; and, second, "that it is not true, as set up in the third paragraph of defendant's answer, that plaintiff is estopped; that defendant has not accounted to this plaintiff as set forth; neither has this plaintiff ever acquiesced in any settlement with, or account rendered by, defendant."

The trial was to a jury. The principal contention around which the battle raged at the trial was as to the quantity of unmerchantable lumber, known as "culls," contained in the shipments made. The plaintiff, while conceding that culls were not within the terms of the contract, yet contended that all the lumber shipped was merchantable, while the defendant contended that the discrepancy between the quantity shipped and the quantity accounted for was attributable to the presence of culls in the shipments. At the conclusion of the testimony the defendant asked the court, and it refused, to give the following instructions: "You are instructed that the defendant, the Long-Bell Lumber Company, having rendered to the plaintiffs monthly accounts showing the debits and credits existing between them, and the credits therein being upon account of lumber delivered, and an account of such lumber, giving its grade, and showing the amount culled therefrom as not merchantable, having been rendered plaintiff upon each shipment, then such accounts became stated accounts, and, unless objected to within a reasonable time, became binding upon the plaintiffs; and they can only object to them now upon the ground of fraud or mistake. I instruct you, as a matter of law, that the evidence shows that the plaintiffs did not object to the grading, and did not object to the culling from the lumber of certain amounts, as unmerchantable, within a reasonable time; and hence your inquiry in this case is confined to the simple question as to whether the defendant, the Long-Bell Lumber Company, practiced upon the plaintiffs a fraud in the grading and culling of the lumber shipped, or whether the grading and culling was founded upon a mistake as to grades and culls; and in the latter case, if, after full knowledge of the grades and amount of culls made upon each car, the plaintiffs acquiesced therein, then they are estopped to claim now that such grades and culls were founded upon mistake." "The defendant having fur-

nished the plaintiffs with a statement of the grades of the lumber shipped, and the amount of lumber rejected as unmerchantable, the plaintiffs must have objected within a reasonable time to the grades and culls so stated; and if they failed to do so within a reasonable time, and accepted the purchase price of the lumber at the grades, and less the rejected lumber, then they became bound by the grading and culling so reported to them, and cannot in this suit reopen that question." To which action of the court in refusing said instructions the defendant duly excepted. Among the instructions given by the court of its own motion, to which exceptions were taken, are the following: "(2) The court instructs you that, under the contract upon which suit is brought, when the Petross-Stump Lumber Company sawed, stacked, and insured their lumber at the mill— And I just stop long enough to say to you what I mean when I use the word 'contract' hereafter. I mean this paper that is marked as a copy of the contract, and attached to the complaint. The court instructs you that, under the contract upon which suit is brought, when the Petross-Stump Lumber Company sawed, stacked, and insured their lumber at the mill, and the agent of the Long-Bell Lumber Company had inventoried the same, and the Petross-Stump Lumber Company had turned the lumber over to the said agent, that the lumber at the mill became the lumber of the Long-Bell Lumber Company, as soon as the said agent had received said lumber, and furnished a statement thereof to the plaintiff company: that is, to the Petross-Stump Lumber Company,—the men who sawed it. (3) The court further instructs you that, when the lumber was so received by the Long-Bell Lumber Company as their lumber, it was received as merchantable lumber, under the terms of the contract, subject, however, to be graded under the rules adopted by the Southern Lumber Manufacturers' Association for grading lumber. Either party therefore had the right to grade the lumber, and no place was fixed in the contract as to where, when, or by whom it should be graded. The evidence tends to show that both parties undertook to grade the lumber according to the rules adopted by the Southern Lumber Manufacturers' Association. Whether either party did so is a question of fact for you to determine." "(5) The defendant alleges in its answer that the plaintiffs had assigned all their interest under the contract sued on to the Bank of Springdale, Arkansas, before the suit was instituted. The plaintiffs deny this. The letter introduced is sufficient to convey the interest of the plaintiffs in the contract to the bank. Plaintiffs introduced evidence tending to show that the paper offered in evidence tending to show the assignment was intended to convey their interest in the contract sued on, as collateral security to the bank for the payment of a debt which plaintiffs owed to the bank, and that said debt was discharged before the institution of this suit, and that the contract and rights and interest under it reverted to them before the institution of this suit. If, therefore, you find from the evidence that the assignment was made simply as collateral security, and that the debt was discharged before the suit was brought, then whatever interest in the contract had been assigned as collateral security upon the payment of the debt at once reverted to the plaintiffs; and plaintiffs would have a right to sue upon the contract in their own names, and recover from the defendant whatever was due thereupon in their own right, if you find anything was due." The jury returned a verdict for plaintiff in the sum of $1,108.15. The defendant brings the case here on writ of error.

W. R. Cowley, for plaintiff in error.

A. F. Miles (O. L. Miles, on brief), for defendants in error.

Before SANBORN and THAYER, Circuit Judges, and PHILIPS, District Judge.

PHILIPS, District Judge, after stating the case as above, delivered the opinion of the court.

The conservative rule in instructing a jury is to confine the charge to the real and decisive issues in the case. By so doing, mere discursive discussion of abstract questions is avoided, whereby the minds of jurors are often diverted to the consideration of improper issues, calcu-

lated to mislead to the prejudice of one of the parties. If there was no estoppel in the case, as claimed by defendant, the vital question at issue was whether or not any of the lumber, and how much, was unmerchantable. This was a fact to be determined by the method stated in the contract, to wit, "Subject to the grades adopted by the Southern Lumber Manufacturers' Association." The contract does not, in terms, specify by whom or when this grading was to be made. The reasonable inference would be that both parties were to participate. One thing, however, is clear, and that is that the contract, on its face, does not contemplate that the grading by which the merchantable character of the lumber was to be ascertained was to be made by plaintiff alone at the time of stacking at the mill, so as to bind the defendant. This was, in terms, guarded against in the last paragraph of the written contract, as follows:

"It is expressly understood and mutually agreed upon that the company [that is, the defendant] is under no obligation, by reason of taking the entire output of the mill, to accept any lumber that will not meet the requirements of the grades referred to."

Looking at the contract as an entirety, from its four corners, and having regard to the situation of the parties, the practical meaning of it is that as the plaintiff, before shipment, was to receive on all the lumber stacked up, except as to star and clear, $5 per 1,000, on 120-day acceptances, with the option of a 4 per cent. discount for cash payments, and the remainder on the same terms, "when the stock is shipped out," the object of taking an inventory at the mill becomes obvious. To secure the purchaser, the lumber was then to be insured, and turned over to the agent, which lumber "was to become [not which then and thereby became] the property of the said company," the defendant. This prepayment evidently was to enable the plaintiff to obtain the necessary means for running the mills and paying the hands. If any doubt remained as to this interpretation, it is entirely removed by the conduct and actions of the parties. There is no better established rule, or one more instinct with the spirit of equity, in the construction of contracts wanting in perspicuity or clearness of meaning, than to adopt that which the parties, by their course of dealing, placed upon it before any controversy arose between them. "In cases where the language used by the parties to the contract is indefinite or ambiguous, and hence of doubtful construction, the practical interpretation of the parties themselves is entitled to great, if not controlling, influence. The interest of each generally leads him to a construction most favorable to himself, and when differences have become serious, and beyond amicable adjustment, it can be settled only by arbitrament of law. But in an executory contract, and where its execution necessarily involves a practical construction, if the minds of both parties concur there can be no great danger in the adoption of it by the court as the true one." Chicago v. Sheldon, 9 Wall. 50, 54; Topliff v. Topliff, 122 U. S. 131, 7 Sup. Ct. 1057. "Courts may use the actual construction put thereon by the conduct of the parties under the contract as a controlling circumstance to determine the construction which should be put upon the contract in enforcing the rights of the parties." Thomas v. Railway Co., 81 Fed. 919; Sanders v. Munson,

20 C. C. A. 581, 74 Fed. 651.    Again it is held that one of the most satisfactory tests of ascertaining the true meaning of a contract is by putting ourselves "in the place of the contracting parties when it was made, and then considering, in view of all of the facts and circumstances surrounding them at the time it was made, what the parties intended by the terms of their agreement.    When their intention is thus made clear, it must prevail in the interpretation of the instrument, regardless of inapt expressions or careless recitations."    Rockefeller v. Merritt, 22 C. C. A. 608, 76 Fed. 915.    During the whole period of dealings between these parties after the lumber was shipped, as it came in by car loads, it was graded by the defendant at the point of destination, under the rules of the Southern Lumber Manufacturers' Association.    Thereupon the accounts of these shipments and gradings were sent at the beginning of each month, by mail, to the plaintiff, with acceptances for the amount due thereon, which plaintiff accepted, without more.    What occasion, therefore, was there for the court to say to the jury, as it did in the instructions excepted to, that when the plaintiff sawed, stacked, and insured the lumber at the mills, etc., "the lumber at the mill became the lumber of the Long-Bell Company, as soon as the agent had received said lumber, and furnished a statement thereof to the plaintiff company"?    The issue in this respect being solely as to whether the lumber delivered contained culls, and, if so, how much, why advise the jury that when the plaintiff turned the lumber over to defendant's agent the lumber at the mill became the lumber of the defendant?    The contract simply said, "Which [meaning the lumber] was to become the property of said company."    The effect of this was manifestly calculated to impress the jury with the thought:    If the defendant then and thereby became the owner of the lumber, the plaintiff had performed its part of the contract; and why, therefore, should defendant undertake to bind the plaintiff by any grading afterwards done by its agents and servants in the absence of the discharged vendor?    The court went further in this direction, by charging the jury "that, when the lumber was so received by the Long-Bell Lumber Company as their lumber, it was received as merchantable lumber, under the terms of the contract."    It is true, this was qualified by adding, "subject to be graded under the rules adopted by said association."    But this did not prevent misconception by the jury.    It was calculated to shift in the minds of the jury the burden of proof.    The last clause of the contract, as already shown, purposely guarded the purchaser, by reason of taking the entire output of the mill, against any liability for any lumber that did not meet the requirements of the grades referred to.    More than this, as already adverted to, the course of dealing between the parties declared their understanding to be that the defendant was to render an account of the grading, and finally settle therefor, after the lumber was received at Van Buren.    It was then and there that the defendant threw out what it deemed to be culls.    Why, then, instruct the jury that when the lumber was received at the mills it was received as merchantable lumber?    Under the pleadings, the burden rested on the plaintiff to show that the lumber was merchantable.    Rather, therefore, should the jury have been told that no implication arose that all the lumber

stacked and inventoried at the mills was merchantable, within the terms of the contract; but its quality remained to be ascertained, subject to the test of the rules of the Southern Lumber Manufacturers' Association. These instructions were misleading and liable to prejudice the jury against the defendant. It was therefore error to give them, in the form employed.

The more important question, as it is more decisive of this controversy, is the estoppel pleaded in the answer. It is a well-settled and wholesome rule of law that, between merchantmen dealing with each other in a successive series of like transactions, accounts rendered by one to the other from time to time, showing the state of dealings between them, and not objected to within a reasonable time, become stated accounts, concluding the parties, so that they cannot be reopened except for fraud or mistake. Wiggins v. Burkham, 10 Wall. 129; Oil Co. v. Van Etten, 107 U. S. 333, 334, 1 Sup. Ct. 178; Lockwood v. Thorne, 11 N. Y. 170; Burke v. Isham, 53 N. Y. 631. "When the account is stated between the parties, or when anything shall have been done by them which by their implied admission is equivalent to a settlement, it has then become an ascertained debt.   *   *   *   All intricacy of account, or doubt as to which side the balance may fall, is at an end." Toland v. Sprague, 12 Pet. 333. The evidence shows, clearly enough to put it beyond debate, that, for the two years or more during which the shipments of lumber were made under this contract, the defendant, at the beginning of each month, up to the assignment of the contract to the bank, rendered to the plaintiff a full account of the lumber received the preceding month,—giving the date, quantity, and grading, as also the amount due thereon to the plaintiff,—and forwarded the statements, with defendant's acceptances therefor, which the plaintiff at once cashed or negotiated. And after the assignment of the contract to the bank a like course was pursued, in rendering these statements to the bank, and making payments thereon to it, which were accepted by the bank without one word of objection or protest. Mr. Petross, one of the plaintiffs, at the trial testified as follows:

"Q. Each of the statements they sent you showed the number of culls, and the amount? A. Yes, sir. Q. Shows the dimensions of the pieces of culls that were thrown out, does it not? A. Yes, sir."

On every principle of justice and fair dealing, it was the duty of the plaintiff, as of the bank, its assignee, on receipt of this statement, and before the appropriation of the proceeds of the acceptance, to have examined the accounts so rendered (and the presumption is that it did so), and, if dissatisfied with the grading or computation, to have, by post or messenger, promptly notified the defendant of any dissatisfaction with the account. Wiggins v. Burkham, supra. This course was demanded in justice to the defendant company. After it had rendered an account therefor each month to the plaintiff, and paid therefor, the lumber would be sold, and pass out of its present form into various structures, and the culls would be abandoned to waste and decay. And it was of the utmost importance to the defendant to know whether it was to be held liable to further inspection, grading, and accounting. The plaintiff produced not a word of evidence, in a

single letter, making complaint of the gradings and accounting. All the correspondence between them in evidence only showed complaint (or, rather, suggestions) from plaintiff pertaining to such matters as shortage in quantity in some car, or some particular car not accounted for. Some of these discrepancies were explained in the letters, and the presumption is to be indulged that they were all satisfactorily adjusted, as no further complaints appear in the correspondence. The only attempt on the part of plaintiff, at the trial, to show any objection to the statements rendered to it, consisted in the most trivial and unsatisfactory statements by some of the employés of plaintiff as to some talk had at some indefinite time with some of the employés of defendant, to the effect that they thought the defendant's agents were rejecting too much of the lumber shipped. But there was no reliable, tangible evidence to warrant a jury in saying that any such complaints were made directly by plaintiff to the defendant company. And, even if such talk had occasionally occurred between some of the employés of the two concerns, yet if thereafter the plaintiff and its assignee, the bank, received payments from the defendant on statements sent in, without making a direct protest within a reasonable time, it ought not now to be heard to ask that the accounts be reopened. The only avoidance of the legal effect of the stated accounts is to impeach them for fraud or mistake. The answer pleaded the facts constituting estoppel. The reply put in issue nothing but a denial of the fact that defendant had rendered the accounts, or that plaintiff acquiesced in any settlements. No issue of fraud or mistake in the stated accounts was raised by the reply. The only question, therefore, to be passed upon by the jury touching this issue, was, were the accounts so rendered, and did plaintiff thereafter, in a reasonable time, make objection thereto? The first and third instructions asked by the defendant should have been given. While the first instruction went further than the issues required, in asking to have submitted to the jury any question at all respecting fraud or mistake, it was no reason for the rejection that the defendant thereby accorded to the plaintiff the benefit of such avenue of escape. This error was not cured by the charge given by the court on this issue. In the first place, the court left it entirely to the jury to find whether the notice, if any, of objection to the stated accounts, was given in a reasonable time. As applied to the facts of this case, where these accounts were rendered monthly through a period of two years and more, the question of reasonable time is wholly one of law, for the court. Wiggins v. Burkham, 10 Wall. 132, 133; Oil Co. v. Van Etten, 107 U. S. 334, 1 Sup. Ct. 178. In the second place, the court in its charge also applied the estoppel to the defendant if the jury found that the plaintiff had rendered accounts to it, and it failed to make objection thereto. There was no such issue presented by the pleadings. The plaintiff did not sue upon an account stated, but upon an open, running account. Nor was there any evidence to support such issue, if it had been within the pleadings. The instructions given by the court are in other respects objectionable, but as no exceptions were taken thereto, and no assignment of error was made thereon, they will not be noticed.

This brings us to the consideration of the final question raised in this connection. It is suggested that inasmuch as the defendant did not except to, nor assign error on, the instruction in question, as given by the court, it is presumed to have waived the exception taken to the action of the court in refusing the instructions asked by it, and to have acquiesced in the error committed by the court. To this we cannot assent. After diligent search, we find no precedent for this practice. The furthest the courts have gone in the denial of the litigant's right to complain of the error of the court in refusing a proper instruction is where the court, in another instruction given, laid down the equivalent of the declaration asked by plaintiff in error, or where, notwithstanding the court has improperly declared the law, the party complaining has justified it by committing the same blunder in a declaration requested by him, or where he has invited the court to commit error. In Dows v. Rush, 28 Barb. 180, the court laid down the recognized rule of practice, that if a party would raise the objection to the charge given, that it is not sufficient or proper, it should appear that he had refused to deliver a correct proposition on the precise point desired by the party excepting. The court say:

"If he had so refused, a proper exception would have been to such refusal."

In Railway Co. v. Boyce (Kan. App.) 48 Pac. 949, of the refusal to give a proper instruction, the substance of which was not given in the general charge, the court said:

"Where special instructions, correct in point of law, and conforming to the facts at issue, are refused, their substance must be given, or the general charge, considered as an entirety, must sufficiently cover the matter presented."

So, in Milling Co. v. Ames, 23 Colo. 171, 47 Pac. 382, the court regarded the error sufficiently saved, when taken to the refusal of the court to grant an instruction asked for, where no equivalent of the proposition was found in other portions of the charge. The court said of this refusal:

"This was error. We do not find that the substance of either of these instructions which were refused by the court was given in any of the instructions by the court of its own motion, but, on the contrary, in so far as there was an attempt to instruct upon these points the law was not correctly given."

The case of Earle v. Thomas, 14 Tex. 584, presents this question quite aptly. In speaking to the objection that the exception to the charge of the court was not properly saved in the assignment of errors, Wheeler, J., said:

"In the present case the error complained of is suggested by the instruction refused. It has sometimes been said that a party, to take advantage of any error in the charge of the court, must except; but by this it is not intended that he shall take a bill of exceptions, for he may attain the same purpose by asking such instructions as will place the law of the case in a proper light before the jury, which, if refused, will have the effect of a bill of exceptions."

In Evans v. Clark (Ind. T.) 40 S. W. 771, it is held that where the applicant requested the giving of a proper instruction, which was refused, it is not necessary, in order to insist upon error of such refusal, that the party should have excepted to an inconsistent instruction given by the court. The court said:

"Where a party takes proper exception to any matter in the record, it is not necessary to take other exception, if the exception thus taken covers the matter in issue."

While this is the language of the court of appeals of the Indian Territory, it is nevertheless valuable for the force of the reason assigned. See, also, Guinard v. Knapp, Stout & Co. Co. (Wis.) 70 N. W. 671, where the court lays down the rule to be that the refusal to give a correct instruction is reversible error, unless it appears that the same was substantially given in the general charge. Having requested the court to give a proper declaration of law, and the court, by its refusal, having declared that it held the law to be otherwise, to which exception was duly taken, why should counsel be required again to except to the converse or modified declaration given by the court? It would be but a repetition of the objection already expressed in the first exception. And, so far from the silence of counsel at the reassertion of the error by the court evidencing a waiver of the first error, it but evinces a respectful deportment by counsel towards the court, in refraining from repetitious objections at the ruling of the court, after having once taken exception involving in effect the same principle which would be represented in the second exception.

In view of the conclusion reached by the court, it is not deemed necessary to consider other assignments of error. It results that the judgment of the circuit court is reversed, and the cause is remanded, with direction for further proceedings in conformity with this opinion.

THAYER, Circuit Judge. I am not able to concur in the foregoing opinion. The case is reversed, as it seems, for alleged error on the part of the trial judge in giving two instructions of its own motion, and for error in refusing two instructions which were requested by the defendant company. I am unable to discover any material error in the two instructions which the trial court gave of its own motion. These instructions declared, in effect, that the lumber involved in the controversy became the property of the defendant, the Long-Bell Lumber Company, when its agent had received the same at the plaintiff's mill, and had furnished a statement of the amount to the plaintiff company, and that when so received it was accepted on behalf of the defendant company as merchantable lumber, subject to its right to have it graded according to the rules adopted by the Southern Lumber Manufacturers' Association. These instructions, in my judgment, embodied a correct interpretation of the contract between the parties. The acceptance of the lumber did create a presumption, for the time being, that it was merchantable, but the purchaser retained the right to cast out the culls if a more careful examination showed that it was not all merchantable. The other instructions which the trial court gave, as well as the two instructions under consideration, showed that the right of the purchaser to make a subsequent inspection was fully conceded, and that the first acceptance of the lumber at the mill was merely tentative, and simply created a presumption until further examination that it was merchantable. I am at a loss to conceive how the jury could have been misled by these instructions. The second refused instruction, quoted above in the statement, obviously required the jury to

determine whether the plaintiff below had objected to the grades and culls within a reasonable time after it was notified thereof by the defendant. The trial court adopted that view of the case, by submitting to the jury the precise issue which it was asked by this instruction to submit. The language of the court in that respect was as follows:

"On the other hand, if the defendant, within a reasonable time after receiving the statement and grades as furnished by the plaintiffs, graded the lumber itself, and furnished plaintiffs' with a statement of the amount and grades as it had graded it, then the law required the plaintiffs, if they were dissatisfied with the grading which the defendant had made, to give notice thereof; and, if they failed so to do within a reasonable time, then they would be bound by the grading as done by the defendant, and could only be heard now to complain on the ground of fraud or mistake."

Error, therefore, cannot be assigned for the refusal of the defendant's second instruction. The defendant had the full benefit of that instruction in the charge as actually given.

The defendant's first refused instruction, which is also quoted above in the statement, is at variance with its second instruction, in this: that in one of the instructions the court was asked to determine, as a matter of law, that the plaintiff had not objected to the grading in a reasonable time, while in the other instruction it was asked to allow the jury to decide that issue. If the record showed that the trial court was first asked to pursue the former course, and upon its declining to do so an exception was saved, and that the court was thereupon asked to give the other instruction, which was also refused, I should have no doubt of the defendant's right to urge both of its exceptions. I think, however, that when two contradictory requests are presented at the same time, and the trial court is required to choose between them, and it adopts one of the requests, error cannot be assigned in an appellate tribunal because of the refusal of the other. When two contradictory instructions are asked, the record, in my judgment, ought to show affirmatively that they were presented separately, and that the one was asked because the court had declined to grant the other. Counsel ought not to be allowed to offer inconsistent requests at one and the same time, and, if one is granted, assign error for the refusal of the other. But, if I am mistaken as to the correct rule of practice in this regard, I think it is nevertheless true that this court cannot say that the trial judge erred in refusing to direct the jury, as a matter of law, that the evidence showed that the plaintiff did not object to the grading and culling of the lumber within a reasonable time, because the bill of exceptions does not show that we have before us all the testimony. At the end of the bill of exceptions is this phrase, and nothing more, "Testimony closed;" and this court has heretofore decided, in Corporation v. Hage, 32 U. S. App. 548, 16 C. C. A. 339, and 69 Fed. 581, that such a phrase, found in a bill of exceptions, is not tantamount to a statement that it contains all the testimony. As it does not appear, therefore, affirmatively, that we have before us all the evidence which was heard during the progress of the trial, we cannot say that the trial court erred in refusing the instruction now under consideration, but must presume, in support of the judgment, that the instruction was properly refused.

Touching the merits of the case, I deem it proper to say that the

record discloses, without contradiction, that a very large amount of lumber was shipped by the plaintiff company from its mill to the defendant company, which was not paid for. The defendant says that the difference is accounted for by unmerchantable lumber, or culls, that it had the right to reject, and did reject. On the other hand, the plaintiff contends that it shipped no culls, and that the poorest of the lumber shipped, whether it consisted of culls or otherwise, was worth at least $5 per 1,000, and that the defendant retained it in its possession, and has paid nothing therefor. The case seems to have been one which was peculiarly appropriate for a jury, and I am opposed to disturbing their verdict, except for substantial errors clearly apparent upon the face of the record, which, in my judgment, do not exist, or at least have not been pointed out.