## INDIAN TERRITORY ILLUMINATING OIL CO. v. BARTLESVILLE ZINC CO. et al.

## BARTLESVILLE ZINC CO. et al. v. INDIAN TERRITORY ILLUMINATING OIL CO.

(Circuit Court of Appeals, Third Circuit. March 27, 1923. Rehearing Denied May 28, 1923.)

Nos. 2933, 2934.

**I. Principal and agent ⬤=>129—Stockholders owning all the stock of corporation, organized and known to be acting as their agent to make and carry out contract, may sue thereon.**

Complainants *held* entitled to sue on a contract made between defendant and a corporation, all the stock of which was owned by complainants, and which was organized, as known to all parties to act as an agent of complainants for the purpose of making and carrying out the contract.

**2. Contracts ⬤=>170(1)—Practical construction by parties best evidence of their understanding and intent.**

Where the execution of a contract involves a practical construction of it, and the minds of the parties agree on it while they are engaged in its performance and before any controversy has arisen concerning its interpretation, that construction is one of the best indications of their true intent.

**3. Gas ⬤=>13(1)—Contract to furnish gas from wells on land leased by seller held to continue under new lease; "renewal or extension."**

Defendant, a producer of gas from wells on Indian lands held under a lease then having about three years to run, made a contract with complainants, representing certain smelters, to furnish gas for their use for the remaining period of the lease and for the period of "any renewal or extension" thereof, complainant to pay any additional royalties or burdens placed on defendant in case of renewal or extension. At the time both parties knew that because of an intervening act of Congress there could not be a technical renewal or extension of the old lease, but it was hoped that a new lease could be obtained and this was done; complainants assisting. The new lease did not cover as much land as the old and provided for a higher royalty, but covered the wells from which gas was to be supplied under the contract. For some three years thereafter defendant continued to perform the contract, complainants paying the additional royalty, and then it refused to further perform, claiming that the contract terminated with the expiration of the old lease. *Held*, that the new lease was a "renewal or extension" of the old, within the meaning of the contract, and that complainants were entitled to specific performance.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Renewal.]

**4. Gas ⬤=>13(1)—Contract to furnish natural gas construed.**

A contract by which defendant agreed to supply gas to complainant for use from wells to be drilled within a specified zone, including 133,000 acres, and to produce a gas field therein "of a nature and in a location satisfactory to" complainant, and complainants agreed to construct and maintain at its own expense a pipe line connecting with the wells, *held* to leave defendant free to drill wells in any part of the zone and to dispose of their product, but not to require complainants to connect their pipe line with all such wells, where they were so far distant from their point of use as to render such connection impracticable for their purposes, under penalty of being charged with their production under the contract.

Appeal from the District Court of the United States for the District of New Jersey; Charles F. Lynch, Judge.

Suit in equity by the Bartlesville Zinc Company and the National Zinc Company against the Indian Territory Illuminating Oil Company. From the decree, both parties appeal. Modified and affirmed.

Treacy & Milton and John Milton, all of Jersey City, N. J. (Chas. A. Frueauff and Watson B. Robinson, both of New York City, and Burdette Blue, of Bartlesville, Okl., of counsel), for Indian Territory Illuminating Oil Co.

Joseph B. Cotton, of New York City, Edgar R. Rombauer, of St. Louis, Mo., Clifford I. Voorhees, of New Brunswick, N. J., and Roy F. Wrigley, of New York City, for Bartlesville Zinc Co. and another.

Before WOOLLEY, Circuit Judge, and WITMER and GIBSON, District Judges.

WOOLLEY, Circuit Judge. By the bill in equity filed in this suit the plaintiff zinc companies sought an injunction permanently enjoining the defendant oil company from disconnecting certain of its natural gas wells from the plaintiffs' pipe line and from refusing to furnish them with gas through their pipe line drawn from wells in an area belonging to the defendant and known as the "Smelter Primary Zone." The court entered a decree granting substantially the prayers of the bill and providing, inter alia, for the connection of the plaintiffs' pipe line with the defendant's gas wells throughout the area or zone from which the plaintiffs are entitled to collect and the defendant is bound to supply gas under a contract made by the oil company with the Smelter Gas Company and known as the Smelter Gas Contract. From the decree both parties appealed; the defendant from the decree at large, as it reflects the main issue; and the plaintiffs from a single provision affecting the performance of the affirmed contract.

Appeal of the Indian Territory Illuminating Oil Company.

After a long and labored study of the record and briefs—immense in size and out of all proportion to the issues involved—we have arrived at the conclusion of the learned trial judge. As we have reached our judgment by the same channels of reasoning, we shall, to avoid repetition, adopt his opinion as our own. It reads as follows:

Lynch, District Judge. In my memorandum upon the motion for a preliminary injunction in this case granting the preliminary restraint asked for, I stated that the principal issue seemed to be whether there is in existence a contract requiring the defendant to supply gas fuel to the plants of the plaintiffs at Bartlesville, Oklahoma.

Such a contract is claimed by the plaintiffs to be in existence (1) by virtue of a "legal" renewal of a written contract and (2) by renewal thereof by agreement of the parties.

The "legal" renewal claimed is the renewal of a contract, dated August 31, 1912, between the defendant and the Smelter Gas Company a corporation.

The Smelter Gas Company was incorporated under the laws of Oklahoma by John H. Brennan, general counsel of the defendant company the entire stock of the corporation being subscribed by the plaintiffs herein as follows: Bartlesville Zinc Company—60%; National Zinc Company—40%.

The formation of the Smelter Gas Company was incident to negotiations which resulted in a contract providing for the defendant's supplying to the

Smelter Company for the use of the Bartlesville Zinc Company, National Zinc Company and Lanyon-Starr Company, which latter company was after-wards acquired by interests controlling the Bartlesville Zinc Company, gas fuel required by the three smelter companies in the operation of their Bartlesville Smelters. Prior to the making of the Smelter Gas Contract, the gas fuel used by these smelters was obtained from other sources.

The defendant when it entered into the Smelter Gas Contract was in the possession and control of certain oil and gas rights in approximately 680,000 acres of land belonging to the Osage Indian Tribe and situated in what is known as the Osage Indian Reservation under and by virtue of a lease known as the "Foster lease" terminating March 16, 1916. The defendant originally had the oil and gas rights in approximately 1,600,000 acres of this Osage territory under a lease dated March 16, 1896, which has been referred to as the "original Foster lease." The "original Foster lease" running for a period of ten years was, by the Act of Congress of March 3, 1905, extended for a period of ten years from and after March 16, 1906, to the extent of 680,000 acres. It was while the defendant was operating under the extended lease (the "Foster lease") that the Smelter Gas Contract was entered into, under which contract gas was to be taken from certain zones located in the 680,000-acre tract. As provided in the contract the defendant, from the date of the making thereof, regularly and uninterruptedly furnished through pipe lines laid by and belonging to the Smelter Gas Company large quantities of gas to the plaintiffs, for which the plaintiffs paid at the rate of 4 cents per thousand cubic feet until March 16, 1916, when the rate was increased to 7 cents per thousand cubic feet because of additional royalties awarded the Osage Indian Tribe by the Interior Department of the United States, the leasing of this Indian land being under Government supervision. From March 16, 1916, to date, the plants of the plaintiffs have secured most, if not all, of the gas fuel consumed by them through the pipe lines connected with the gas acreage held by the defendant under its lease.

[1] In my opinion on the preliminary injunction I expressed the view that the plaintiffs, being the real parties in interest, were entitled to prosecute this suit. The facts clearly indicate that the Smelter Gas Company acted simply as the agent of the plaintiffs for the purpose of obtaining this gas supply; that such agency was not only at all times known to the defendant but defendant's representatives actually created it for that purpose. The defendant demands, under threat of shutting off plaintiffs' gas supply, a higher rate per thousand cubic feet of gas furnished than is provided for in the contract. Hence this suit.

Plaintiff seeks the specific performance of their alleged contract. They pray for a permanent injunction enjoining the defendant from disconnecting certain gas wells from the pipe line owned or controlled by the plaintiffs; from ceasing to furnish gas to the plaintiffs; from interfering with the connection of new gas wells; from selling or turning over the gas from such new gas wells to others or from in any manner interfering with the furnishing of gas by the defendant to the plaintiffs' smelters under the provisions of the alleged contract. If there is a contract in existence by reason of a legal renewal of a former contract, the relief prayed for by the plaintiffs should be granted. If, however, there is not in existence a contract by reason of such a legal renewal, then it becomes necessary for the Court to determine whether the relations created by the contract are still in existence because of an agreement which plaintiffs allege was entered into between the parties on January 31, 1916.

So, in taking up the question of "legal renewal," it would seem that there should be considered the situation the parties had in mind and which they sought to protect, the language of the contract and the conduct of the parties subsequent to the making of the contract for the purpose of determining whether the parties themselves placed a practical construction thereupon showing what they intended by the terms used.

The defendant had a lease of oil and gas rights covering a large acreage. The plaintiffs were not interested in securing from the defendant oil or oil rights. Their smelters had been constructed for the consumption

of gas and it was gas and gas only that they, through the Smelter Gas Company, sought to obtain from the defendant. The defendant under the Smelter Gas Contract was to provide gas from a certain part of a gas acreage of which the defendant was then in control and possession. This control and possession was at the time limited to a period of about 3½ years. In other words the defendant was in a position to dispose of the gas from that particular gas field for a period of not more than 3½ years.

The plaintiffs undoubtedly were deeply interested in obtaining the continuance of their gas supply from the defendant in the event that the defendant secured a further renewal or extension after March, 1916, of gas rights it then possessed.

So with respect to renewals or extensions the following paragraph (11) was inserted in the Smelter Gas Contract:

"The period for which this contract shall run, unless expiring by other limitations contained herein, shall be for the remaining period that said original Foster lease is to run, and for the period of any renewal or extension of said original Foster lease, Exhibit A, and the said vendee contracts and agreed to use all honorable means and do everything in its power to obtain a renewal of the said original lease now owned by the vendor, which expires by its own limitation on the 16th day of March, 1916.

"In the event that a renewal or extension is granted the said vendor of said lease, and any additional royalties or burdens are placed on it, then such additional royalties or burdens, as far as they may affect natural gas production or natural gas wells embraced under this contract, shall be borne by the vendee herein, in addition to the four cents per thousand cubic feet hereinbefore stipulated to be paid. It shall, however, be optional with said vendee to accept, pay and discharge said additional burden on the one hand, or surrender this contract and refuse to proceed further thereunder."

The "original Foster lease" had expired years before the making of the Smelter Gas Contract. What the parties were referring to was the then existing "Foster lease."

In passing it should be noted that there were not used the terms "a renewal" or "an extension" or "a renewal or extension" but the very broad term "any renewal or extension." What did the parties mean by the use of the words "any renewal or extension?"

"What is meant by the expression 'renewal' of a lease in a given case may depend upon a reading of the whole instrument in which it occurs, and upon the practical construction given to its provisions by the parties themselves." Shamp v. White, 106 Cal. 220, 39 Pac. 537; Howell v. City, etc., 165 Cal. 174, 131 Pac. 130.

[2] In order to ascertain whether there was a practical construction by the parties in the instant case the Court must consider subsequent events.

"Where the execution of a contract involves a practical construction of it, and the minds of the parties agree upon it while they are engaged in its performance and before any controversy has arisen concerning its interpretation, that construction is one of the best indications of their true intent." City of Chicago v. Sheldon, 9 Wall. 50, 54 (19 L. Ed. 594); Long-Bell Lumber Co. v. Stump, 86 Fed. 574, 578, 30 C. C. A. 260, 264; Fitzgerald v. First National Bank, 114 Fed. 474, 478, 52 C. C. A. 276, 280.

What developed?

[3] It appears that on June 28, 1906, there had been passed by Congress an act entitled "An Act for the division of the lands and funds of the Osage Indians in Oklahoma Territory, and for other purposes" (34 Stat. L. 539), relating to gas and oil rights in this Osage Reservation. Of course, the Smelter Gas Contract must be considered to have been drawn in the light of the laws that existed at the time it was drawn. It is improbable that anyone was more familiar with the laws relating to the Osage Indian lands than Mr. John H. Brennan, who during all that period of time was general counsel of the defendant company.

Mr. Brennan, who prepared the Smelter Gas Contract, construed this law to mean that there could not be technically speaking, a renewal or

extension of the so-called Foster lease; that under this act all that could be secured thereafter would be new leases relating to gas only. In March, 1915, when appearing before the Secretary of the Interior, he expressed the view that there was no warrant in law for the renewal or extension of the Foster lease as such. During that month he filed with the department a printed argument (Exhibit P9) entitled "Economic reasons for the continuance, by new lease under the Osage Allotment Bill, of the so-called Foster lease, owned by the Indian Territory Illuminating Oil Company, together with its subleases, in some form to be agreed upon under new rules and regulation," from which brief the following statements are quoted:

"This whole business of the extension of the so-called Foster lease, and about 161 sub-leases, for oil and gas in the Osage Reservation presents characteristics entirely different from any other oil and gas leasing propositions. * * * Here is a case where the oil and gas ownership were separated from the very beginning. * * *

"It is not, strictly speaking, a renewal of the leases that is asked for. * * * * "

At page 10:

"An entirely new, comprehensive deal is anticipated by the petitioners. * * * Thus we can eliminate all provisions in the old lease that will be found impractical, unnecessary or unwise by the Department, and contain such new rules as will meet all objections urged against the old form of lease or old arrangement; the proposition being to preserve as much as possible all the good features of the present arrangement with pertinent conditions that will embrace the relations of the parent company with the Gas Pipe Line Companies. * * *

"The old Foster lease was drawn according to the exigencies of the time of its execution, when there were no oil wells in Oklahoma, when there were no railroad facilities, when the drilling of wells involved the expenditure of approximately $30,000 each, and when the chances were a hundred to one. However, it has served its purpose very well in securing initial, pioneer development, no matter what the hardships were or funds expended. It has served its purpose well during the last ten years under the Act of Renewal. Under it have grown up several important contractual relations between sublessees and the patent company and between the parent company and the Gas Pipe Line Companies, which should find proper expression in any new lease."

And at page 26:

"Therefore, we have been of the opinion that these contractual relations should be considered in the making of any new lease or the renewal of old ones."

And at page 31:

"It is an economic benefit to the tribe to continue what may be called the secondary relation established between the Indian Territory Illuminating Oil Company and the great pipe line companies that carry gas to distant markets. It will be observed that these contracts only cover the surplus gas that may be obtained and would otherwise be lost and dissipated if a market was not found therefor. It will be observed that these relations and contracts as now executed give full protection to the Osage tribe of Indians and the inhabitants of the Osage Reservation as well as the producers drilling for oil by an absolute first call on all the gas produced under the Foster lease, if necessary for the uses embraced in the Reservation.

"We dare say that Departmental officials and gas experts, industrious for the protection of the Osage Indians and the particular environment in which they have their homes, could not have devised any more particular rules and regulations covering that particular subject than these contractual relations entered into by the Indian Territory Illuminating Oil Company for its own benefit. It is needless to urge that these very reservations must have been a drawback in the negotiations for the contracts with the Pipe Line Companies and the Smelter Companies, and must have had especial influence upon the price received for the gas to be delivered under the contracts."

Mr. Brennan, in response to the question, "Should the Foster lease as a whole be renewed?" answered, "No," and then proceeded to state why in his opinion oil and gas should be separated.

Would it be unfair to infer that Mr. Brennan, must have had in mind when he prepared the Smelter Gas Contract the impossibility of securing a strict renewal or extension of the Foster lease when he inserted the term "any extension or renewal"?

What next occurred?

On June 17, 1915, there was passed by the Osage Indian Tribe, owners of this gas acreage, what has been termed a Tribal Resolution. This resolution separated the oil from the gas absolutely. A reading of it (page 11), I think will clearly demonstrate this. In that Tribal Resolution the royalty on gas was changed and other proposed conditions respecting gas leases were dealt with. So, on June 17, 1915, there vanished all possibility of the defendant's obtaining a strict renewal or extension of the gas and oil rights which it owned on August 31, 1912. On that date it became known to the defendant that it would not secure a strict renewal or extension of its Foster lease.

As required by the Tribal Resolution just referred to, the Indian Territory Illuminating Oil Company, the defendant, on August 31, 1915, accepted the provisions of that resolution regarding its gas (nothing being said about oil), on condition that it be granted practically its present holdings (page 12).

How did the defendant regard the situation created by the Tribal Resolution? If it was the attitude or belief of the defendant that the Tribal Resolution of June 17, 1915, terminated conclusively the Smelter Gas Contract on March 16, 1916, was that attitude or belief indicated by the expression or conduct of any person or persons connected with the defendant company? Let us examine their words and actions subsequent to June, 1915.

The defendant early in 1916, applied for a renewal or extension of its "Foster lease." But it did not seek a renewal or extension with respect to all of its gas acreage.

On January 31, and February 1, 1916, at hearings at the Interior Department, Mr. Charles F. Leech, of the defendant company, in the presence of Mr. Brennan, general counsel of the defendant, Mr. Foster, its president, and Mr. A. Mitchell Palmer, special counsel, stated that under their then existing lease, the leased territory consisted of approximately 500,000 acres; that 150,000 acres thereof were worthless and that therefore their application in substance was for about 350,000 acres of gas rights.

Mr. Carl E. Kayser, president of the Smelter Gas Company, attending the same hearing, also made some significant remarks. He was asked, "How long does your contract with the Indian Territory Illuminating Oil Company last?" and his answer was, "For the term of the Foster lease, or as long thereafter as they get another lease." No one protested or challenged this statement of Kayser's, either at the time it was made or later.

It is difficult to consider the record of the hearings held by the Department January 31 and February 1, 1916, without becoming impressed with the idea that the defendant in asking the Department for certain acreage—less acreage than that covered by its existing lease—was seeking territory which would be amply sufficient to continue to supply gas to the smelters under existing contracts, including the Smelter Gas Contract. Certainly there was no statement by anybody on the part of the defendant that the contractual relations created by the Smelter Gas Contract had been terminated by reason of the Tribal Resolution or otherwise. If there was such a statement I have failed to find it.

And then we have the telegram of Mr. Foster to Mr. E. O. Jacobsen of the plaintiff National Zinc Company, viz:

"Washington, D. C., Feb. 25, 1916.

"E. O. Jacobsen National Zinc Co., 2 Stone St., New York City. Making what appears to be good progress with the department. Am working on tentative contract to be submitted Monday Have further conference tomorrow You are fully protected as to acreage Will keep you posted but can not leave her for a few days.                    H. V. Foster."

In the face of this telegram can it be inferred that it was the defendant's attitude that the acreage sought to be obtained was not for the benefit of the plaintiffs under their contract rights? If there is anything in the record which indicates that the attitude of the defendant between the time of the passage of the Osage Trial Resolution and the execution of the new Indian lease (April 17, 1916) was that after March 16, 1916, there would no longer be contractual relations under the Smelter Gas Contract, it has not been disclosed to me.

Is it not apparent that the parties themselves, before the new lease was obtained, were of the opinion that, in order to secure an extension or renewal of the Smelter Gas Contract within the meaning of the language used in that instrument, there would not have to be a literal renewal covering all of the oil and gas rights?

After considerable negotiation with the representatives of the Department of the Interior, the defendant with the assistance and co-operation of the Smelter Gas Company and plaintiffs, on March 17, 1916, secured, under what has been called a new Indian lease, gas acreage to the extent of 302,000 acres. It did not receive a strict renewal or extension of either the gas or oil rights which it possessed under the "Foster lease" on August 31, 1912. On that date it had gas mining rights in 553,460 acres. It had large oil acreage and oil royalties. It was deprived of a renewal of its oil acreage and approximately 250,000 acres of gas rights. With respect to the 302,000 acreage which it did receive, the royalty thereon to the Indians was increased; new regulations and new restrictions were imposed; as well as limitations of the amount of gas that might be taken from a gas well, but included in the acreage which the defendant did receive was the larger part of the acreage containing all or most of the wells from which the gas supplying the plaintiffs' smelters was taken. Every developed and producing gas well that the defendant had was retained by it under this new instrument and besides there was awarded to it for further exploitation a large acreage. The defendant secured a renewal or extension of the acreage in which the plaintiffs were solely interested and with which they were exclusively concerned. What the defendant lost were oil and gas rights with which the plaintiffs had no concern whatever.

Again, referring to the application of the defendant for a continuance of rights possessed under the "Foster lease," as well as what it received by way of the new Indian lease, the defendant had a contract, executed prior to the Smelter Gas Contract, with the Wichita Pipe Line Company and the Quapaw Gas Company, corporations, which instrument was known as the "Pipe Line contract." This Pipe Line contract related to certain areas known as the pipe line primary zones. The acreage secured by the defendant under the new Indian lease was the acreage covered by the Smelter Gas primary zone and practically all of that covered by the Pipe Line primary zone. The Pipe Line zone and the Smelter Gas zone were the two principal gas fields which the defendant had developed under its Foster lease. Is it not plain that the parties and the Department were dealing on the theory that if the territory or substantially the territory from which the smelters were getting gas and the pipe line was getting gas were included in the new Indian lease, such inclusion or continuance should be deemed to inure to the benefit of the parties to those contracts?

After the acreage of the defendant was obtained by it under the new Indian lease it continued to supply gas to the plaintiffs through the Smelter Gas Company down to February 1, 1919, almost three years. Instead of a charge of 4 cents per thousand cubic feet (the rate provided by the Smelter Gas Contract) the charge was 7 cents per thousand cubic feet, the increase of three cents being the additional royalty to the Indians imposed by the new Indian lease. It is true that additional royalties and perhaps other burdens were added by the new Indian lease but that contingency was provided for in paragraph 11 of the Smelter Gas Contract under

which the Smelter Gas Company was to assume such additional royalties and burdens, which in this case it did assume.

To me it seems to be quite evident that when the parties contracted by the Smelter Gas Contract they did not have in mind in using the term "any renewal or extension" that in order to work a renewal or extension of this Smelter Gas Contract the entire 680,000 acres with oil and gas rights would have to be obtained, and the actions of the parties to the Smelter Gas Contract, both before and after March 16, 1916, seem to me to be in harmony with the idea that they were in full agreement as to what the obligations of the contract were. The construction placed upon this instrument by these parties was the natural and logical one when the contract itself is read in the light of the facts and circumstances under which it was executed.

Summing up the situation in the light of the law as it was when the contract was made, in the light of the facts then and there existing, in the light of the language used and in the light of all that was said and done by the parties thereto, I cannot avoid the conclusion that the new Indian lease of April 17, 1916, obtained by the defendant, in law worked a legal renewal and extension of the Smelter Gas Contract. The plaintiffs are therefore entitled to a decree.

### Appeal of Bartlesville Zinc Company and National Zinc Company.

In harmony with the opinion of Judge Lynch, a decree was entered by which the court held the Smelter Gas Contract in force, and, as construed and defined, required that it be specifically performed; and enjoined the oil company from disconnecting any of the natural gas wells from the pipe line of the Smelter Gas Company, the plaintiffs' subsidiary, and from ceasing to furnish natural gas from its wells for the operation of the plaintiffs' smelters.

[4] After argument—not at the trial on the merits, but at the time of framing the decree—this provision was introduced into the decree:

"It is further hereby ordered, adjudged and decreed by the Court that the defendant shall not be obligated to produce or develop a supply of gas for the plaintiffs or their said agent; and that the total amount of gas available in said Smelter Primary Zone at any and all times shall be regarded as connected with and available for the said plaintiff and their said agent, within the limitations of said Smelter Gas Contract, whether or not they shall have actually extended and connected to the said wells."

This paragraph was inserted on the contention of the oil company that as the court had sustained the right of the plaintiffs to extend their pipe line to and connect it with any and all gas producing wells within the Smelter Primary Zone which the oil company then had or might later bring in, that right carries with it a corresponding obligation on the part of the plaintiffs to extend their pipe line and connect it with all wells, old and new, wheresoever located in that zone, and to take from each well a proportionate part of the contract quantity of gas there available. This is the interpretation which both parties place upon the paragraph in question and particularly upon the words "connected with and" as they appear therein.

The plaintiffs contend that the legal effect of this provision of the decree is to impose an obligation upon them not found in the contract and that its practical effect is to require them to extend their pipe line over long distances and at costs so great as to nullify all advantage of the contract which the court had sustained in their favor. Admittedly

the contract contains no express words covering the situation. We are called upon, therefore, to construe the contract. This we shall do, certainly not by supplying terms which the parties had not agreed upon, but by noting the conduct of the parties and ascertaining how their minds had met upon this phase of the contract while they were engaged in its performance and before any controversy arose concerning its interpretation. Chicago v. Sheldon, 9 Wall. 50, 54, 19 L. Ed. 594; Long-Bell Lumber Co. v. Stump, 86 Fed. 574, 578, 30 C. C. A. 260, error, affirmed, see McCook et al. v. Wood, 172 U. S. 645, 19 Sup. Ct. 878, 43 L. Ed. 1183; Fitzgerald v. First National Bank, 114 Fed. 474, 478, 52 C. C. A. 276. We shall search for the meaning of the contract as Sugdan sought the meaning of a deed when he said:

"Tell me what you have done under such a deed, and I will tell you what that deed means."

Abbreviating the matter as much as possible, it appears that when the plaintiffs (always speaking of them as acting through the Smelter Gas Company) entered into the contract with the oil company for gas with which to operate their smelters, an area of about 179,000 acres was set apart for that purpose and described as the Smelter Primary Zone, reduced under the new Indian lease to 133,280 acres, yet still known by the same name. As gas had not been developed, the contract called for the exploration of this territory. To this end the plaintiffs advanced the oil company $30,000. With this sum the oil company drilled wells in the northern part of the zone nearest the plaintiffs' smelters and discovered gas. The money was expended and work was done in this part of the zone because the contract called for the drilling of wells and the production of "a gas field of a nature and in a location satisfactory to the vendee," the Smelter Gas Company. Thereupon, quoting from the contract, the "said vendee agrees to lay, build and maintain at its own cost and expense a pipe line with all necessary gathering lines and feeders and of a size sufficient to bring the quantity of gas hereinafter mentioned per day from the wells on said leasehold to the standard proportional meter hereinafter provided to be located near said smelters." Pursuant to this agreement the oil company from time to time drilled, purchased, or otherwise acquired additional wells both in the northern part and in the southern part of the Smelter Primary Zone. To the wells in the northern part of the zone the plaintiffs extended their pipe line and have ever since received gas. To the wells in the southern part of the zone the oil company caused the Quapaw Gas Company, the Osage Producers Company and Wichita Pipe Line Company, its subsidiaries, to extend their pipe lines and draw off the gas for their exclusive use. With the possible exception of one or two wells, the pipe line of the plaintiffs and the pipe lines of the other companies did not connect with the same wells. Each pipe line drew from its connecting wells the whole of their gas flow. A mere glance at the maps in evidence shows that the parties to the Smelter Gas Contract did not, through the years, consider that there was any obligation on the part of the plaintiffs to connect their pipe line with all of the oil company's wells in the Smelter Primary Zone wheresoever situate. On the contrary the picture shown by the maps is that the plaintiffs

connected their pipe line only with gas wells which were, in the language of the contract, "in a location satisfactory to the vendee," that is, the plaintiffs' subsidiary, and which, accordingly, were in the gas field situate in the northern part of the Smelter Primary Zone—territory nearest their smelters.

These are the things the parties did under the contract before the trouble arose. But it was contemplated that some day these wells would play out. What would be the situation then? Certainly the oil company, owner of the gas rights over the entire area, is privileged to bring in other wells whenever it pleases and wherever it chooses to locate them. No right of the plaintiffs that we can find in the contract abridges this right of the oil company. Nor can the plaintiffs now compel the oil company to drill wells in locations of their own selection with reference to their own convenience and economy. On the other hand we find nothing in the contract which compels the plaintiffs to connect their pipe line with any particular well drilled by the oil company or with all the wells the company has developed in the past and may develop in the future. And especially do we find nothing in the contract by which the plaintiffs, on failing so to connect their pipe line with the oil company's wells, shall be chargeable with the gas available from them. So it appears from this contract and the manner in which it has been performed that the parties did not intend that the plaintiffs should control the development of the oil company's property either by designating the location or the number of wells, or that the oil company should destroy the rights of the plaintiffs by compelling them, arbitrarily and perhaps at disastrous cost, to connect their pipe line with every well it should develop in the whole 133,280 acres, or else be charged for the gas flow there available. We think these separate and by no means necessarily conflicting rights of the parties can be exercised by requiring that, on the bringing in of every well in the Smelter Primary Zone, the oil company shall give the plaintiffs an option to connect its pipe line with it, and with every well now in operation, to be exercised within a time to be determined by the learned trial judge on hearing. If the plaintiffs accept the option, then, within another time to be determined, they shall connect their pipe line with such well. Or, if the plaintiffs decline the option, or, accepting it, should fail to make the connection, the oil company shall be free to take all the gas from the well and dispose of it as it may choose. Thus the rights of both parties are conserved. This is our decision. In arriving at it, we have been careful not to change the contract by adding something to it or by taking anything from it, or by enlarging or diminishing the rights and duties which the parties had agreed upon. We only direct that there shall be applied to a situation arising in a controversy the entirely equitable and workable plan which the parties themselves had pursued when at peace.

Therefore we direct that in this one matter the decree below be modified and that, when modified, it be in all respects affirmed.