FITZGERALD v. FIRST NAT. BANK OF RAPID CITY.

(Circuit Court of Appeals, Eighth Circuit. March 24, 1902.)

No. 1,593.

1. CONTRACTS—TERMS HAVE ORDINARY MEANING.

The legal presumption is that the words used in an agreement have their ordinary and customary meaning.

2. SAME—CONSTRUCTION—FUNDAMENTAL RULE.

The basic rule for the construction of a contract is to place one's self in the situation of the parties to the agreement when it is made, and then to ascertain and declare the intent with which they used its terms when their minds met.

3. SAME—PRACTICAL INTERPRETATION PERSUASIVE.

The practical interpretation given to their agreements by the parties to them while they are engaged in their performance, and before any controversy has arisen concerning them, is one of the best indications of their intent.

4. SAME—CONSTRUCTION.

Where A. was building a railroad in two ways: (1) By the use of his own employés; and (2) by the use of contractors, who had agreed to construct certain sections for specified prices,—an agreement to furnish beef to the "men working for" him is not an agreement to furnish it to his contractors, but is limited to a contract to furnish it to his employés or servants.

5. STATED ACCOUNT—ESTOPPEL BY.

One who delivers, or receives and accepts without objection, an account stating the debits and credits between him and the other party to the accounting, is thereby estopped from denying the correctness of the account thus stated, in the absence of fraud, mistake. or undue advantage.

(Syllabus by the Court.)

In Error to the Circuit Court of the United States for the District of Nebraska.

On May 26, 1890, John Fitzgerald & Bro. were engaged in constructing a railroad from Custer City to Deadwood, in South Dakota. They con-

structed a portion of this railroad by means of workmen whom they employed and fed themselves, and other portions by the use of subcontractors, who agreed with them to construct certain portions of the railroad for certain prices. Schleuning & Young were dealers in beef and other meats in Rapid City, S. D. Fitzgerald & Bro. made a written agreement with Schleuning & Young that the latter (called in the contract the "party of the second part") "agrees to furnish beef along the line of the B. & M. Railroad between Custer City and Deadwood, in South Dakota, during the building of said line, to the men working for the said party of the first part, for the sum of 6¾ cts. (six and three-quarters) per lb.; said beef to be of the best quality, and to be furnished whenever desired by the boarding bosses along said line; said party of the second part to be paid on or about the 25th day of the month following that in which the meat is furnished, less eleven per cent. (11%) to be retained by the party of the first part for collection of accounts due to party of the second part for beef furnished in accordance with this contract." Schleuning & Young furnished under this contract meat amounting in value to the sum of $21,622.74, and were paid $21,597.38, leaving a balance of $25.36. A portion of this meat was furnished to men working for Fitzgerald & Bro., and a portion of it to contractors who were fulfilling their agreements with Fitzgerald & Bro. to construct certain portions of the railroad. Monthly statements of the meat so furnished and paid for were rendered to Fitzgerald & Bro. during the progress of the work. This work was commenced in May, 1890, and was completed in December of that year. During this time Chamberlain & Skinner and Wade & Jones were engaged in constructing certain portions of the railroad under contracts with Fitzgerald & Bro., and Schleuning & Young furnished meat of the value of about $4,000 to Chamberlain & Skinner, and meat of the value of about $750 to Wade & Jones. This meat was furnished during all the months between June and December 31, 1890; but no monthly statements of it were presented or delivered to Fitzgerald & Bro. as the work progressed, although such statements were made and presented to Chamberlain & Skinner and Wade & Jones, respectively. Schleuning & Young made independent contracts with Chamberlain & Skinner and Wade & Jones to furnish them meat at a lower price than that specified in the contract with Fitzgerald & Bro. More than three years after the railroad had been completed, and on July 17, 1893, Schleuning & Young made a statement of account against Fitzgerald & Bro., in which they charged them with the meat which they had furnished to Chamberlain & Skinner and Wade & Jones, and assigned the claim based upon this account to the First National Bank of Rapid City, S. D. On September 12, 1893, this bank brought an action against John Fitzgerald and David Fitzgerald, the members of the firm of John Fitzgerald & Bro., to recover the $25.36 conceded to be due upon the account against them, and also to recover the value of the meats furnished by Schleuning & Young to Chamberlain & Skinner and Wade & Jones. The bank alleged, and Fitzgerald & Bro. denied, that the defendants had agreed to purchase and pay for the meats furnished to Chamberlain & Skinner and Wade & Jones, and that they were furnished to them by Schleuning & Young under the contract of May 26, 1890. None of the meat in question was ordered, desired by, or furnished to boarding bosses along the line, for neither Chamberlain & Skinner nor Wade & Jones had boarding bosses on the portions of the railroad which they constructed. At the trial the court instructed the jury (1) that by the agreement of May 26, 1890, Fitzgerald & Bro. agreed to pay Schleuning & Young for all the meat they might sell to subcontractors who under them were constructing portions of the railroad, as well as for the meat which should be furnished when desired by the boarding bosses to the men employed by Fitzgerald & Bro. along the line; (2) that Fitzgerald & Bro. became absolutely liable to Schleuning & Young for all beef furnished subcontractors under that contract, whether the subcontractors ratified and consented to such an agreement and arrangement or not,—and refused to instruct the jury that the meats furnished to Chamberlain & Skinner and Wade & Jones were furnished under contracts with them, and not under the contract between Schleuning & Young and Fitzgerald & Bro. Under these instructions, which are challenged as error, the jury returned a verdict in favor of the bank, and a judgment was rendered against the defendants

for $6,743.07. During the progress of the litigation, John Fitzgerald died, and Mary Fitzgerald, the administratrix of his estate, was substituted for him in the proceedings, and she is now the plaintiff in error in this action.

J. W. Deweese (James Manahan and Frank E. Bishop, on the brief), for plaintiff in error.

Richard A. Jones (H. C. Brome and Arthur H. Burnett, on the brief), for defendant in error.

Before CALDWELL, SANBORN, and THAYER, Circuit Judges.

SANBORN, Circuit Judge, after stating the case as above, delivered the opinion of the court.

The question in this case is whether or not Fitzgerald & Bro. were liable to Schleuning & Young for the meats which the latter furnished to the subcontractors, Chamberlain & Skinner and Wade & Jones, between June 1, 1890, and January 1, 1891, under the contract of May 26, 1890. Chamberlain & Skinner and Wade & Jones held independent contracts with Fitzgerald & Bro. whereby they had agreed to build certain sections of the railroad for specified prices. Schleuning & Young made independent contracts with each of these subcontractors to furnish them meat at a rate lower than that made in their contract with Fitzgerald & Bro., of May 26, 1890, to the end that they might get the meat without paying the commission which Schleuning & Young agreed Fitzgerald & Bro. should receive under that contract for collecting their bills. The meat was delivered to these subcontractors during the months of July, August, September, October, November, and December, 1890; and Schleuning & Young sent them monthly statements of the amounts thus delivered, but did not send such statements of this meat to Fitzgerald & Bro., although they sent to the latter monthly statements of all the meat for which Fitzgerald & Bro. have paid, a portion of which was furnished to other subcontractors.

The court instructed the jury that the contract of May 26, 1890, bound Fitzgerald & Bro. to pay for all meat furnished by Schleuning & Young under it to subcontractors, as well as for that furnished by them to the men whom Fitzgerald & Bro. employed to work for them by the day, and that this absolute liability existed, whether the subcontractors consented to this agreement or not. But Fitzgerald & Bro. were engaged in the construction of this railroad in two ways, —by means of men whom they employed, paid wages, and fed through their boarding bosses, and by means of subcontractors, who built certain sections of the road for certain prices, and who hired and fed their own employés. The contract reads that the party of the second part [Schleuning & Young] agrees to furnish beef "to the men working for the said party of the first part [Fitzgerald & Bro.] for the sum of 6¾ cts. (six and three-quarters) per lb.; said beef to be of the best quality, and to be furnished whenever desired by the boarding bosses along said line; said party of the second part to be paid on or about the 25th day of the month following that in which the meat is furnished, less eleven per cent. (11%) to be retained by the party of the first part for collection of ac-

counts due to party of the second part for beef furnished in accordance with this contract." The legal effect of this agreement was that Schleuning & Young undertook to furnish to the men working for Fitzgerald & Bro., at the price named, such quantities of beef as the boarding bosses should desire; and Fitzgerald & Bro., for 11 per cent. of their amounts, agreed to collect and pay the monthly bills for this beef, if these bills were furnished to them before the 25th of the month succeeding their contracting. The question is, what was the meaning of the words "men working for the said party of the first part"? Did they mean the men hired and employed by the party of the first part, or did they mean the subcontractors who had agreed with the party of the first part to build separate sections of the railroad, as well? Now, the primary and natural meaning of the term "men working for the said party of the first part" is the servants of the party of the first part,—those over whom that party has the power of control; the right to direct them when, where, and how to do the work, and for whose acts the party is liable, under the maxim respondeat superior. It may, indeed, be said that all who are engaged in executing contracts for another are in some sense working for him. But after all, this is not the primary meaning of the words. It is in a secondary and subsidiary sense that such men may be described by this term. Contractors for the construction of a railroad, for the erection of a building, or for the manufacture of a machine do not, in the common understanding of either lawyers or laymen, fall within the class of men who are working for the railroad company, or for the promoter of the building or the machine. They form a different and distinct class,—the class of contractors, as distinguished from the class of servants or employés. In the ordinary and customary interpretation of the words "men working for a party," the class they describe is confined to those who are employed, paid, controlled, and directed by that party, and who are in fact his servants and employés.

The legal presumption is that the terms of a contract are used in their ordinary sense, and that they have their usual meaning; and this presumption points to the conclusion that the men working for Fitzgerald & Bro., to whom Schleuning & Young agreed to furnish as much beef as should be desired by their boarding bosses, were the employés and servants of Fitzgerald & Bro. only, and were not the independent contractors with them who had agreed to build certain sections of the railroad for specified prices. Brady v. Railway Co. (C. C. A.) 114 Fed. 100; Corning v. Board, 102 Fed. 57, 60, 42 C. C. A. 154, 157.

The situation and relations of the parties at the time this agreement was made tend strongly to confirm this construction. Fitzgerald & Bro. were building a portion of this railroad with their own employés, whom they were obliged to provide with food in their camps along the line. They accomplished this through boarding bosses, whom they doubtless employed under the contract that they should collect the bills against them for the beef furnished to them, and should retain 11 per cent. of their amount. All this they had the power and the right to do, because they could, and doubtless did,

employ their workmen and boarding bosses under the terms expressed in the contract of May 26, 1890. But they had no control of the hiring or the managing of the boarding bosses and employés of the subcontractors under them, and no right to subject them to these terms. They were employed, controlled, and paid by the independent contractors beneath them. Moreover, these contractors were not bound by these terms. They were not parties to the contract of May 26, 1890. There was no stipulation in that contract, nor in the contracts under which they were constructing their sections of the road, that they would take any beef of Schleuning & Young at the price named in the contract of May 26th, or at all, or that they would allow Fitzgerald & Bro. to collect the bills against them for 11 per cent. of their amounts; and they were under no legal or moral obligation to do so. In this state of the case, it would be unnatural and unreasonable to expect to find in the contract between Fitzgerald & Bro. and Schleuning & Young any agreement that these subcontractors should take, or that Fitzgerald & Bro. should pay for, beef furnished to them by Schleuning & Young; and the agreement will be searched in vain for any such provision. The practical interpretation given to this contract by the parties themselves while they were executing it demonstrates the fact that Schleuning & Young were not bound to furnish, and Fitzgerald & Bro. were not required to collect their bills for beef furnished to subcontractors. And the practical interpretation given to their agreements by the parties to them while they are engaged in their performance, and before any controversy has arisen concerning them, is one of the best indications of their true intent. Schofield v. Bank, 97 Fed. 282, 38 C. C. A. 179; Publishing Co. v. Swift, 97 Fed. 290, 296, 38 C. C. A. 187, 193; Leavitt v. Investment Co., 54 Fed. 439, 4 C. C. A. 429, 12 U. S. App. 193; Topliff v. Topliff, 122 U. S. 121, 131, 7 Sup. Ct. 1057, 30 L. Ed. 1110; City of Chicago v. Sheldon, 9 Wall. 50, 54, 19 L. Ed. 594.

It will be noticed that in its inception this contract was without consideration, without mutuality, and void, because it specified no amount of beef which Schleuning & Young should furnish, or for which Fitzgerald & Bro. were required to pay. The only measure of the quantity to be found in it is that which should be desired by the boarding bosses along the line. But there was no agreement in it as to what amount these bosses should desire, or that they should desire any. It follows that while the delivery of beef according to the terms of this contract, and the agreement of Fitzgerald & Bro. to pay for the beef thus delivered, constituted sales of the goods thus accepted by Fitzgerald & Bro., yet these deliveries constituted no contract to accept or pay for any beef which Fitzgerald & Bro. refused to accept and pay for under the contract, for the reason that the quantity to be thus accepted and paid for was still undetermined, and there was no valid contract concerning it. Cold Blast Transp. Co. v. Kansas City Bolt & Nut Co., 114 Fed. 77; Crane v. C. Crane & Co., 45 C. C. A. 96, 105 Fed. 869; Oil Co. v. Kirk, 15 C. C. A. 540, 68 Fed. 791.

There is another peculiarity of this agreement which must not be overlooked. It is that Fitzgerald & Bro. were to pay on the 25th

day of the month following that on which the beef was furnished for such quantity of beef as was desired by the boarding bosses, at the price fixed in the contract, less 11 per cent. From the promise to pay monthly, a promise on the part of Schleuning & Young to furnish monthly statements of account, accompanied by the orders of the boarding bosses, is necessarily implied; and this implied stipulation was a material term of the contract, because only by the presentation of such bills and orders could Fitzgerald & Bro. learn the amount to be paid, and collect it out of the sums due to the boarding bosses under the terms of the written contract. So it was only for beef desired by the boarding bosses to feed the men employed by Fitzgerald & Bro., and for which bills were presented to them monthly, that they were required to pay.

Now it is contended that, notwithstanding these provisions of the contract, the parties construed it to bind Fitzgerald & Bro. to pay for the beef furnished to Chamberlain & Skinner and Wade & Jones, because they did pay for beef furnished under this contract to other contractors, namely, to Cable & Chute, Carroll & Donohue, Thomas Mansfield, and Gurley. But the payment for the beef furnished to these four contractors by Schleuning & Young does not tend to establish the conclusion that Fitzgerald & Bro. were bound by the contract to pay for, or that the parties to the contract supposed that they were bound to pay for, the beef furnished to other contractors. The limitations of the agreement—to beef furnished to the employés of Fitzgerald & Bro., to beef desired by the boarding bosses, and to beef for which monthly bills were furnished to Fitzgerald & Bro.— were all for their benefit. They had the right and the power to waive these limitations, either in part or altogether; to agree to pay for beef furnished to certain contractors, or for beef furnished to all the world. If, however, they waived these limitations, and paid 89 per cent. of the bills for beef furnished to Cable & Chute, Carroll & Donohue, Mansfield, and Gurley, that waiver and payment in no way bound them to pay for meats furnished to Chamberlain & Skinner and Wade & Jones, or to any other parties to whom Schleuning & Young might deliver the goods. The truth is that Schleuning & Young had agreed to furnish meat to the employés of Fitzgerald & Bro. at a certain price, and the latter had agreed to collect their bills for 11 per cent. of their amounts. The former were anxious to furnish meat, and the latter were desirous to earn their 11 per cent. The contractors were under no obligation to take meat of Schleuning & Young, nor to permit Fitzgerald & Bro. to collect the bills against them, and retain their 11 per cent., and no contract concerning the beef to be furnished to these contractors had been made. Schleuning & Young persuaded four of the contractors to take meat from them, and to allow Fitzgerald & Bro. to get their 11 per cent. For this meat they sent monthly bills to Fitzgerald & Bro., and the latter collected these bills and deducted their percentage. But all the parties to the contracts and to the transaction understood that the contract of May 26, 1890, neither bound the contractors to take, Schleuning & Young to deliver, nor Fitzgerald & Bro. to pay for, any meat delivered to the contractors That this was the interpretation of the

contract and the understanding of their legal rights by all the parties to the transactions clearly appears from the following facts, which are disclosed by this record: In May, 1890, Schleuning presented to Chamberlain a letter of Mike Corcoran, one of the agents of Fitzgerald & Bro., which stated the price at which Schleuning & Young were to furnish beef under the contract of May 26, 1890, and Chamberlain replied that he could do better. On July 2, 1890, Schleuning & Young made an independent contract with Chamberlain & Skinner to furnish them meat at a price so low that they could get it at the same price as Fitzgerald & Bro. received it, with their commission off. They made a similar independent contract with Wade & Jones. They furnished meat to these contractors from the 1st of July, 1890, to December in that year, inclusive. During all this time they sent to Fitzgerald & Bro. monthly bills of the meat which they furnished to the employés of Fitzgerald & Bro. and to the four other contractors, but they did not include in these accounts any of the beef which they furnished to Chamberlain & Skinner or to Wade & Jones, but they sent monthly bills of this meat to these contractors. The work on the railroad was completed in December, 1890. Between June 1, 1890, and February 1, 1891, Schleuning & Young sent to Fitzgerald & Bro. 12 accounts of beef furnished, but they did not in any one of these accounts charge anything for any of the beef furnished by them to Chamberlain & Skinner or to Wade & Jones. On March 10, 1891, they wrote Fitzgerald & Bro.:

"Will you please remit balance due on your a/c, and don't you think you could be able to secure John Chamberlain and Wade & Jones a/c on a discount? We surely have waited patiently, and you know there is money coming to them from the B. & M. by you. There is a chance for you to make a good discount, as the a/c of them is surely good."

On March 11th they wrote Mr. Cagney, one of the agents of Fitzgerald & Bro.:

"Should you not send us final check, we will draw on you for $5,000, for that is a little less than coming to us, which please honor on presentation."

The amount due them on that day, excluding the Chamberlain & Skinner and Wade & Jones accounts, was $6,084.88. The amount due them, including those accounts, was over $10,800. On March 17, 1891, they wrote:

"In looking over our a/c, found that we forgot to hand in a/c of Wade & Jones, amounting to $802.25. If you can use the same and discount it, all right; otherwise have it returned at once, and by so doing oblige us."

In the last days of March, Fitzgerald & Bro. demanded of Schleuning & Young a final account, and they furnished one, wherein they set forth the debits and credits of the entire account from the beginning of the work to its close. This account contains no charge of any beef furnished to Chamberlain & Skinner, but the last item of the account is a charge for beef furnished Wade & Jones, $802.25. To this account Fitzgerald & Bro. answered:

"The last item of your statement, Wade & Jones, $802.25, cannot be allowed, as you never at any time, nor in any bill, sent an account against these people. Consequently you must not charge us with this item, by including it in your statement at this late date."

On April 4, 1891, Schleuning & Young replied to this letter in these words:

"I expect you are correct in regard to Wade & Jones. I made a draft, and forwarded the same to you; and, as you did not return the same, I expected you would discount 10 %, the same as you would do with other a/cs. If you have a chance to protect me in this a/c, I wish you would do so."

On April 8, 1891, Schleuning & Young wrote to Mr. John Cleary, the bookkeeper of Fitzgerald & Bro.:

"This W. Jones a/c, I know, was not included; but, if you can see a way to help me get it, I will let you an extra fifty dollars to assist me. As I understand, you have not made a settlement with them, and could hold out the same, or can I stop payment in the banks of John Fitzgerald? If so, please be so kind and let me know."

On April 10, 1891, they wrote Fitzgerald & Bro.:

"We also state that we have, as you know, and as we have stated to Mr. Cagney months ago, due us from Skinner & Chamberlain $4,000.00, which we had to furnish at the same price as yourself in a/c that they did not want to take any meat for two months while we were furnishing unless they could get the same for the same as yourself, with commission off; but, if you can handle same, we will turn in a/c's, rather than wait any longer."

The record contains the questionable testimony of Mr. Schleuning to the effect that once or twice he demanded the payment of a part or all of the bills against Chamberlain & Skinner and Wade & Jones from agents of Fitzgerald & Bro., and they agreed to pay them. But he does not claim that he ever presented any claim for these bills in the monthly accounts or in the final account which he rendered, with the exception of the claim in the latter for the bill of Wade & Jones, which his firm immediately conceded, by letter, to be an unfounded demand. There is, indeed, nothing in this record to overcome the conclusive effect of the stated accounts to which reference has been made, and the letters which have been quoted. Schleuning & Young delivered 12 accounts to Fitzgerald & Bro. during the progress of this work, and just subsequent to its completion, none of which contain any claim for beef furnished to Chamberlain & Skinner or Wade & Jones. At the request of Fitzgerald & Bro. they furnished a final account in which they made no claim for the beef furnished Chamberlain & Skinner, but which contained a claim for that furnished to Wade & Jones, which they immediately afterwards, in writing, conceded was improperly charged against the defendants. It is not claimed that Schleuning & Young were induced by fraud, mistake, or by the taking of any undue advantage, to state these accounts; and in the absence of fraud, mistake, or undue advantage, an account stated is conclusive, and estops the party who presents it from assailing its correctness. Porter v. Price, 80 Fed. 655, 657, 26 C. C. A. 70, 72, 49 U. S. App. 295, 300; Atkinson v. Allen, 71 Fed. 58, 60, 17 C. C. A. 570, 572, 36 U. S. App. 255, 260; Lockwood v. Thorne, 11 N. Y. 170, 62 Am. Dec. 81; Davenport v. Wheeler, 7 Cow. 231; Wiggins v. Burkham, 10 Wall. 129, 19 L. Ed. 884; Philips v. Belden, 2 Edw. Ch. 1; Langdon v. Roane's Adm'r, 6 Ala. 518, 41 Am. Dec. 60; Oil Co. v. Van Etten, 107 U. S. 325, 1 Sup. Ct. 178, 27 L. Ed. 319; Bank v. Morgan, 117 U. S. 96, 6 Sup. Ct. 657, 29 L. Ed. 811; Manufacturing Co. v. Starks, 4 Mason, 297, Fed. Cas. No. 11,802; 1 Am. & Eng. Enc. Law, 121.

114 F.—31

These accounts alone are ample to prove that the parties to the contract of May 26, 1890, did not construe it to bind Schleuning & Young to deliver, or Fitzgerald & Bro. to pay for, meat delivered to Chamberlain & Skinner and Wade & Jones, at the price named therein. This conclusion becomes irresistible when it is considered that Schleuning & Young conceded in their letter that they made independent contracts with Chamberlain & Skinner and Wade & Jones to deliver them meat at a price lower than that named in the contract of May 26, 1890, because the latter were unwilling to pay the commission which that agreement guarantied to Fitzgerald & Bro.

In the construction of a contract, the great desideratum is to ascertain and declare the intent of the parties to it when they made it. The basic rule for its interpretation is to put one's self in the place of the parties when their minds met upon the terms of it, and then, from a consideration of the entire agreement, its purpose, and the circumstances surrounding the parties, to find what they intended to agree to do. In view of the facts that the natural and primary meaning of the term "men working for the said party of the first part" is servants and employés of that party, and not contractors who are not subject to the command or control of the party; that Fitzgerald & Bro. were using their own employés, whom they fed through their own boarding bosses, to construct a part of the railroad, while they had let contracts to independent contractors for the construction of other sections of it; that they had the power to hire the former, subject to the terms of the contract of May 26, 1890, but that they gave the latter such contracts that they were not in any way subject to or bound by those terms; that the legal presumption is that the terms of a contract are used in their ordinary and customary sense, and that the parties to this contract, in the 13 stated accounts which passed between them in the years 1890 and 1891, and in their letters concerning them, both conceded that Schleuning & Young were not bound to furnish, and Fitzgerald & Bro. were not liable to pay for, the meat furnished to the contractors Chamberlain & Skinner and Wade & Jones,—the conclusion is irresistibly forced upon our minds that the only men to whom Schleuning & Young agreed to furnish beef by the contract of May 26, 1890, were the employés or servants of Fitzgerald & Bro., and the only beef for which the latter agreed to pay was the beef furnished to such employés.

The result is that the charge of the court was erroneous in two particulars: First, in that it declared that Fitzgerald & Bro. were liable to pay for beef furnished to their subcontractors; and, second, in that it declared that this liability existed whether the subcontractors consented or assented to the furnishing of beef to them under the terms of the contract of May 26th or not. The judgment below is accordingly reversed, and the case is remanded to the circuit court, with directions to grant a new trial.

THAYER, Circuit Judge (concurring). The sole question of fact which the lower court submitted to the jury for its determination was whether the beef supplied to the two subcontracting firms of Chamberlain & Skinner and Wade & Jones was sold and delivered to the said

firms on their credit, and under the contracts made by those firms with Schleuning & Young on or about July 2, 1890, or whether the meat was delivered to Chamberlain & Skinner and Wade & Jones under the contract which Schleuning & Young had entered into with Fitzgerald & Bro. on or about May 26, 1890, and on the credit of the latter firm. The theory of the lower court appears to have been that as there were two contracts in existence with different parties, under which the meat might have been delivered, that party was liable whom the plaintiffs below trusted and intended or elected to hold when the meat ordered was delivered. The court below instructed the jurors that this issue of fact was the real issue for them to determine, and it was the issue on which the decision of the case hinged, so far as the jury was concerned. In view of the facts alluded to in the main opinion,—that Schleuning & Young, after their contracts with Chamberlain & Skinner and Wade & Jones were entered into, rendered monthly bills for the meat delivered to these subcontractors, to them; that they did not render bills therefor to Fitzgerald & Bro. for such meat from and after July 1, 1890; and that in their correspondence and dealings with Fitzgerald & Bro. they practically admitted on several occasions that the meat delivered to the two subcontracting firms was not chargeable to Fitzgerald & Bro.,—I am of the opinion that it conclusively appears that Schleuning & Young sold and delivered the meat for which they now seek to hold the firm of Fitzgerald & Bro. liable to Chamberlain & Skinner and Wade & Jones, and on the credit of the latter firms, and that the attempt now made to hold Fitzgerald & Bro. was an afterthought. In the face of such evidence as the record contains, showing an evident intent to deal with Chamberlain & Skinner and Wade & Jones, and to extend credit to them for the meat which they ordered, I think the lower court erred in submitting to the jury the question whether the meat was sold on the credit of Fitzgerald & Bro. On this ground, and no other, I concur in the reversal of the judgment of the lower court. I conceive that owing to the uncertainty which attends the construction of the contract between Fitzgerald & Bro. and Schleuning & Young, on which this action is brought, and because of the contemporaneous construction of the contract by the parties themselves, the lower court may have construed that contract correctly as embracing meat which might be ordered by and delivered to all of the subcontractors under Fitzgerald & Bro., who were engaged in building the line of road referred to in the contract,—between Custer City and Deadwood, S. D. I think, however, that as Chamberlain & Skinner and Wade & Jones saw fit to enter into contracts of their own for the supply of meat with Schleuning & Young, and as the latter firm, after making such contracts, rendered all of their bills to Chamberlain & Skinner and Wade & Jones, and did not attempt to charge Fitzgerald & Bro. therefor until long after the meat was supplied, and on one or two occasions admitted that Fitzgerald & Bro. were not liable to pay for such meat, it is now too late to interpose that claim. If the firm of Schleuning & Young was at one time in a situation, as it may have been, to elect whom they would charge, they made such an election long before this suit was brought, and cannot depart therefrom.