## MISSOURI PAC. R. CO. v. HOLT.

(Circuit Court of Appeals, Eighth Circuit. September 4, 1923. Rehearing Denied December 3, 1923.)

No. 6283.

1. **Railroads ⬤➔303(4)—Statute requiring railroad to build bridge and city to maintain "floors" includes wooden stringers.**

The word "floors," in Acts Ark. 1907, p. 606, §§ 1–5, requiring a railroad to build a steel and wooden bridge over its tracks at a street crossing, and

---

providing that, after the bridge has been built, the city shall maintain the "floors" includes the wooden stringers or joists on which the planks rested and to which they were nailed, in view of the fact that it was impossible to remove the stringers without damaging the planks, and that both the city and railroad had so construed the act and had made repairs accordingly.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Floor.]

**2. Statutes ⟷181(2)—Construction leading to absurd or impractical results avoided.**

A construction leading to absurd or impractical results should not be placed on a statute.

**3. Statutes ⟷181(2)—In case of ambiguity, construed so as not to work hardship.**

Where the language of a statute is ambiguous or uncertain and doubtful, it will not be construed so as to work a hardship or inconvenience in its execution, if that can be avoided.

**4. Contracts ⟷170(1)—Statutes ⟷218—In case of uncertainty, construction made by parties followed.**

The courts will follow the construction made by the parties interested, if there be doubt or uncertainty on the face of a statute or contract as to its meaning.

**5. Statutes ⟷75, 97(2)—Act requiring railroad to build bridge over track at street crossing and city to maintain floors held constitutional.**

Acts Ark. 1907, p. 606, §§ 1-5, requiring a railroad to build a steel and wooden bridge over its tracks at a street crossing, and providing that after the bridge has been built the city and not the railroad shall maintain the floors, *held* not unconstitutional, as a local or special law vacating streets, or as suspending the operation of a general law for the benefit of a particular corporation, or otherwise.

**6. Statutes ⟷162—General rule as to repeal of special by general act.**

Specific legislation in relation to a particular class or subject is not affected by general legislation in regard to many classes or subjects, of which that covered by the specific legislation is one, unless the general legislation is so repugnant to the special legislation that the legislators must be presumed to have intended thereby to modify or repeal it.

In Error to the District Court of the United States for the Western District of Arkansas; Frank A. Youmans, Judge.

Action by Delia Holt, by her next friend, Delia Holt, against the Missouri Pacific Railroad Company. Judgment for plaintiff, and defendant brings error. Reversed and remanded.

Robert E. Wiley, of Little Rock, Ark. (Edgar B. Kinsworthy, of Little Rock, Ark., on the brief), for plaintiff in error.

B. E. Carter, of Texarkana, Ark. (Jacob M. Carter and Paul Jones, both of Texarkana, Ark., on the brief), for defendant in error.

Before LEWIS and KENYON, Circuit Judges, and TRIEBER, District Judge.

LEWIS, Circuit Judge. This action was begun in the State court on behalf of Delia Holt, a minor, against the City of Texarkana, Ark., and plaintiff in error, railroad company, to recover damages on account of personal injuries received by the child, occasioned by her falling through a bridge or viaduct in College street in said city, extending over the tracks and yards of the railroad company. After removal of the

cause to the Federal court on petition of the railroad company, on the ground of diversity of citizenship, the city obtained an order remanding it to the State court as against the city. The right of recovery alleged against both defendants was that they had negligently failed and refused to maintain the bridge in a reasonably safe condition for use by the public and had negligently permitted the plank in the floor to become loose from their fastenings and out of place, and to remain in that condition so that the child, in attempting to cross over the bridge on December 2, 1921, while on her way from home to school, fell through an open place in the floor to the railroad tracks below, a distance of 20 feet, and received permanent injuries. It was further alleged that the bridge was built in compliance with the Legislative Act of May 6, 1907 (Acts 1907, p. 606), but that the Act was void because of certain constitutional objections thereto which are stated in the complaint. The answer admitted that the bridge was built pursuant to the Act of May 6, 1907, alleged that the Act was not void, and that under its provisions the railroad company was not bound to maintain the floor of the bridge.

[1] The plaintiff in error is the successor of the Iron Mountain Railway Company, which built the bridge pursuant to the Act. The liability of the former is based on the claim that it, as purchaser of the Iron Mountain road, assumed all of the duties and liabilities of the latter; and as the liability, if any, of the Iron Mountain Company, and in turn that of plaintiff in error, must be determined from the terms of the Act and the obligation and duties imposed by the Act, it is necessary to set forth that Act in full. It reads as follows:

"An act to require the St. Louis, Iron Mountain and Southern Railway Company to build a bridge or viaduct at Texarkana, Arkansas, and authorize the city of Texarkana, Arkansas, to vacate the streets and abolish grade crossings and condemn property for said purposes.

"Be it enacted by the General Assembly of the State of Arkansas:

"Section 1. That the city of Texarkana, Arkansas, is hereby authorized and empowered to condemn all property other than that of the St. Louis, Iron Mountain and Southern Railway Company, which it may be necessary to condemn for the construction and maintenance of a viaduct or bridge where the tracks of the St. Louis, Iron Mountain and Southern Railway Company are crossed by College Street, and said Railway Company shall pay one-half of the adjudged cost and damages of condemnation and the city of Texarkana, Arkansas, the other half; and the city of Texarkana, Arkansas, is also authorized and empowered to abolish grade crossings where said railroad tracks are crossed by said College Street, also to abolish grade crossings over the tracks of the said railway company at approximately nine hundred feet northeasterly from College Street crossing, and vacate said streets at grade crossings.

"Section 2. That the St. Louis, Iron Mountain and Southern Railway Company is hereby required to build a viaduct or elevated steel and wooden bridge, not less than twenty-four feet wide and well banistered for the use of footmen or pedestrians and vehicles, over and across the yard and tracks of the said railway company where said yard and tracks are crossed by College Street and to extend out into said College Street with its approaches a sufficient distance at each end to make the incline accessible for pedestrians and vehicles. The said railway company shall, after said bridge or viaduct is built, maintain all parts of said bridge or viaduct except the floors, but after said floors have been substantially built by said railroad company, they shall be maintained thereafter by the city of Texarkana, Arkansas. The said rail-

road company shall be under no obligation to, in any way, maintain said floors, unless damaged by the railroads.

"Provided, the said St. Louis, Iron Mountain Railway Company, shall not be required to build said bridge or viaduct nor to begin its construction until the city of Texarkana, Arkansas, has abolished said grade crossings, vacated said streets and secured release from all property owners, releasing the said St. Louis, Iron Mountain and Southern Railway Company, from all damages and all liability, except as hereinbefore provided, to said property owners, on account of any damage or injury caused by the construction or maintenance of said viaduct.

"Section 3.  The said St. Louis, Iron Mountain and Southern Railway Company shall cause to be furnished by a competent engineer, plans and specifications for the said bridge or viaduct, designating the kind of material to be used and the character of the work and said engineer shall have the authority to reject any material or work that is not satisfactory and shall report the same when the bridge or viaduct has been completed to the city council of the city of Texarkana, Arkansas, for its approval or rejection, who shall examine the report and have power to accept or reject the bridge or viaduct, unless the same shall have been built according to the plans and specifications furnished by said engineer, and in case it shall be rejected by the council, then the said railroad company shall make such changes and alterations as required by said engineer, to make the bridge or viaduct conform to the specifications made by the said engineer.

"Section 4.  The St. Louis, Iron Mountain and Southern Railway Company shall pay for the construction of said bridge or viaduct and shall have same completed within one year after the said city of Texarkana has vacated the said streets, and abolished the grade crossings, and delivered to the said railroad company the release from the property owners as required by this Act, and if the said railway company shall fail or refuse to comply with the provisions of this Act, it shall be guilty of a misdemeanor, and upon conviction shall be fined in any sum not less than fifty dollars nor more than two hundred dollars for each day said bridge or viaduct shall not be built after the time specified in this Act, for its completion, and the failure to do so each day after said time shall constitute a separate offense.  The ordinance abolishing street grade or 900 feet crossing shall take effect on completion and approval of the viaduct.

"Section 5.  That this Act shall take effect and be in force from and after its passage.  Approved May 6, 1907."

The Iron Mountain Company completed the construction of the bridge in 1909, and on June 24th of that year the city council of Texarkana passed a resolution pursuant to Section 3 of the Act, accepting the bridge on behalf of the city.  After the bridge was accepted the railroad company paid no attention to the upkeep and repair of the floor, either that part used for vehicles or the footway used by pedestrians, through which the child fell.  That was all looked after and attended to, in so far as it had attention, by the city.  The entire floor became very much out of repair, and from time to time the city, by order of the council, purchased new material and paid for work done in repairing it.  The railroad company at no time had any part in the purchase of material or the work done in making repairs, and no one claimed or suggested that it was its duty to do so.  From 1917 on to the time the accident occurred the condition of the floor was very much neglected, and it became dangerous to cross the bridge on that account.  For a while it was closed to traffic of all kinds.  The city through its officers had full information of its condition, and at times neglected to repair it because there were no funds for that purpose.  The framework was steel, on which were laid supports of wood (va-

riously called stringers, or sleepers or joists) running lengthwise the bridge, to which boards or plank were nailed, making the floor. The principal defect which brought about the dangerous condition from time to time was found to be in the supporting joists or stringers; they became rotted and decayed and would not hold the nails or spikes that had been driven through the plank into them. This condition threatened the dropping through of the plank at places. The plank were found out of place at times along the footway. Some of them fell through to the ground. The exhaust from passing engines below would occasionally throw them to one side. The plank on the footway were 4 feet long and 12 inches wide, and the hole in the floor through which the child fell was at a point where one of these plank was missing. The city made repairs of the floor on account of weak and rotted joists in 1917 and 1918, and was again doing work of that kind in 1921, just before the accident, but work was stopped a few days before the accident occurred, because the city did not have the needed lumber to complete the work. It resumed making the needed repairs a short time afterward. The closing of the bridge to traffic in 1920 was on account of the decayed and dangerous condition of the joists or stringers. Its dangerous condition at that time became so notorious that the chamber of commerce of the city called a meeting to consider what should be done in the premises. No one there suggested that the railroad company should make those repairs, it was believed to be the duty of the city. The railroad company did, however, look after the steel framework and saw to it that it was kept up, but at no time did it give any attention to the condition of the floor plank and the wooden stringers or joists upon which the plank rested, and to which they were nailed, and at no time did the city claim that the railroad company was under obligation to do so.

Over objection of counsel for plaintiff in error the court permitted carpenters and builders to testify that the stringers or joists to which the floor plank were nailed were not a part of the floor. It also refused to strike out that testimony after it had been admitted. It refused to instruct a verdict for defendant below. When it came to instruct the jury the court said to the jury that if the joists or stringers were a part of the floor the railroad company was not liable, but it left the jury to determine whether they were a part of the floor.

The bridge was 1,200 feet long, including dirt-filled approaches at its ends, and 24 feet wide. The footway on one side was 4 feet wide and the remainder of its width was for heavy traffic. A knowledge of the bridge structure is important. It was supported on steel columns set in concrete, and steel girders of considerable length were fastened to and extended from column to column on either side. On top of these girders steel beams were placed crosswise at appropriate intervals on which to put the floor structure. This completed the steel work or frame structure of the bridge. As said by counsel, the frame of the bridge was like a huge ladder placed in a horizontal position, held in place by the steel pillars under it. On top of the steel cross-beams wooden stringers or joists were laid running lengthwise the bridge, to which the floor plank were nailed. These stringers or joists under the

footway were 2½ inches thick and 10 to 12 inches wide, laid on edge. The floor plank were nailed down on them with large nails that extended into the joists to a depth of six or seven inches. The bridge as thus completed by the Iron Mountain Company and accepted by the city comprised two distinct parts, (1) a supporting steel frame work and (2) wooden joists or stringers to which the floor plank were nailed. To this structure accepted by the city we apply that part of section 2 of the Act reading thus:

"The said railway company shall, after said bridge or viaduct is built, maintain all parts of said bridge or viaduct except the floors, but after said floors have been substantially built by said railroad company, they shall be maintained thereafter by the city of Texarkana, Arkansas. The said railroad company shall be under no obligation to, in any way, maintain said floors, unless damaged by the railroads,"

for the purpose of ascertaining the duties, respectively, imposed on the railway company and the city. Counsel for plaintiff below tried the case on the claim and contention that the stringers or joists to which the floor plank were nailed were not a part of the floor of the bridge, and for that reason it was not the duty of the city but of the railroad company to keep the stringers or joists in repair, that the floor in the footway consisted only of the floor plank, and they deduced evidence, as has been said, to establish that claim and contention, and the court submitted the case to the jury on that theory, leaving it to the jury to find as a fact whether the stringers or joists were a part of the floor. We think it clear from the quoted part of section 2, as applied to the character of structure disclosed by the record, that the claim relied on and submitted did not present issues for determination by the jury, but that it was the duty of the court to decide them as issues of law. First, because the expression used in Section 2, excerpted above, does not support the plaintiff's contention, but bears with greater force to the contrary. On completion of the steel framework the only thing left to be done to complete the bridge was to build the floors, and that could not be done without the stringers, the floor plank and the nails,—"after said floors have been substantially built by the said railroad company (says the Act) they shall be maintained thereafter by the city." What floors shall be maintained by the city? Those that had been built of stringers, floor plank and nails. The expression strongly signifies that the floor, as built, which the city and not the railroad company was bound by the Act to maintain, was the combined floor structure, consisting of stringers, plank and nails, and there is no intimation that any one of the three indispensable elements was to be segregated from the other two and then called or considered the floor which was to be maintained by the city. A question much like this was disposed of by the Supreme Court of Iowa in Cedar Rapids & M. C. Ry. Co. v. City of Cedar Rapids, 173 Iowa, 386, 155 N. W. 842. The language of the statute which the court was there called upon to interpret was this:

"That in every such city the owner of any street railway occupying or using any bridge shall construct, reconstruct and repair the paving or floor on said bridge three and one-half feet each way from the center line of the space between the rails of its tracks." Code Supp. 1913, § 1056a44.

The main structure of that bridge was of iron or steel, while the planking and its supports laid over and upon the steel structure were of wood. The old planking and timbering had become more or less decayed and weakened. The city council made an assessment against the street railway company for its proportion of the cost of reconstructing and repairing the floor of the bridge. The contention of the railway company was that it could only be assessed for the cost of the planking laid on top of the stringers which were supported by the steel framework, and that the assessment included the supporting stringers or joists, which under the statute it could not be made to pay for. The court reached the conclusion that the stringers or joists were a part of the floor which it was the duty of the railway company to reconstruct and repair. That conclusion was arrived at from definitions of what constitutes a floor, found in the Standard and Century Dictionaries, Encyclopedias and technical works on architecture and building. They treat the word in a double sense, as meaning the layer of boards on which people tread, and as also meaning the framework or structure of joists supporting the flooring of a room. When used in the latter sense it is called by some "naked flooring." The interpretation thus given of the statute does not appear to have been seriously opposed by the railway company, if confined to the meaning of the word floor, but it argued that the word "flooring" there found had a narrower meaning than "floor." That called for construction, and the court held that, considering the purpose of the statute, the two words were of the same import. Sullivan v. B. & A. R. Co., 210 Mass. 229, 96 N. E. 347, is also in point. That case presented the inquiry as to whether the Town of Natick or the railroad company should maintain the floor on a viaduct over the railway. The viaduct was composed of girders, beams and stringers, all of steel. On top of the steel stringers was laid an under-floor of plank three inches in thickness, and on top of that was laid a wearing surface of two-inch spruce plank. The statute under consideration was this:

"The expense and maintenance of repair shall be paid as follows: * * * The framework of the bridge and its abutments shall be maintained and kept in repair by the railroad corporation, and the surface of the bridge and its approaches shall be maintained and kept in repair by the city or town." St. 1906, c. 463, pt. 1, § 38.

The upper-planking had been replaced from time to time by the town, and it contended that it was the duty of the railroad company to repair the under-planking. The court treated the superstructure of the bridge as consisting of two main features, the iron and steel framework on one side, and the under-flooring and wearing surface on the other side. They were in contradistinction. The court held that the town was bound to renew the under-planking and said:

"This interpretation seems more simple, direct and natural, and avoids some troublesome questions of liability which might arise if the maintenance of different layers of plank laid one upon the other were apportioned to different parties."

[2] But conceding that an interpretation of the bare words of the Act does not lead us to a clear understanding of their meaning and

293 F.—11

the true legislative intent, and that they need construction in application to the structure with which they dealt,—then, secondly, no construction ought, or in justice can, be placed on them that would inevitably lead to absurd or impracticable results. Black on Interpretation of Laws, p. 104; Stockyards Co. v. Nichols, 243 Fed. 511, 516, 155 C. C. A. 207, 1 A. L. R. 547.

[3] If the language of a statute is ambiguous or uncertain and doubtful it should never be construed so as to work hardship or inconvenience in its execution, if that can be avoided. 2 Lewis' Sutherland, Stat. Constr. (2d Ed.) § 490; U. S. ex rel. v. Commissioner (C. C. A.) 285 Fed. 295, and cases cited. What is the result if plaintiff's contention, which she sought by proof to bolster up and sustain, be adopted? When the railroad company should conclude that all stringers ought to be torn out and replaced with new, the city might have a contrary view, or that only part of them were defective, and standing on its judgment decline to replace and nail down the plank. Other absurd conditions and conflicting purposes may be easily anticipated, leading to both public and private inconvenience. The floor structure was a unit, and it is impracticable to tear out and renew one part without seriously encroaching on the others. The Act separated and divided the duty and responsibility, and plaintiff's contention would make it, in a practical sense, joint.

[4] Thirdly, ever since the completion of the bridge and its acceptance by the city there has been a uniform contemporaneous construction of that part of the Act which imposes the obligation of maintenance and repair. Both city and railroad company at all times regarded the entire floor structure, including joists, plank and nails as the floor of the bridge, the public openly and expressly acquiescing, and the city did all of the work and furnished all of the material that was used for the purpose of keeping it in repair. At no time did the railroad company believe, nor did the city claim, nor did any one suggest, that it was the duty of the railroad company to make those repairs. One of the established and accepted rules is, that courts will follow the construction made by the parties interested, if there be doubt or uncertainty on the face of the statute or contract as to its meaning. The rule is so general and firmly established that it is hardly necessary to cite authorities. In Chicago v. Sheldon, 9 Wall. 50, 54 (19 L. Ed. 594), it is said:

"In cases where the language used by the parties to the contract is indefinite or ambiguous, and, hence, of doubtful construction, the practical interpretation by the parties themselves is entitled to great, if not controlling, influence."

In that case a city ordinance was under consideration, presenting for determination the question as to whether the cost for certain street improvements provided for under the ordinance should be assessed against the street railway company or the owners of lots abutting on the street. In Hahn v. U. S., 107 U. S. 402, 2 Sup. Ct. 494, 27 L. Ed. 527, the construction of an Act of Congress was involved, and the Supreme Court again stated the principle, that "in the case of a doubtful and ambiguous law, the contemporaneous construction of those who have been called upon to carry it into effect is entitled to great respect,"

and added that it would refuse to interfere with such construction after it had been acted upon for a long time. See also 2 Lewis' Sutherland, Stat. Constr. (2d Ed.) § 472, et seq.; U. S. v. Finnell, 185 U. S. 236, 244, 22 Sup. Ct. 633, 46 L. Ed. 890; Fitzgerald v. Bank, 114 Fed. 474, 52 C. C. A. 276; City of New York v. Ry. Co., 193 N. Y. 543, 86 N. E. 565.

The record unavoidably presented for consideration and application the three principles that have had attention, as questions of law to be decided by the court, and not by the jury. None of them, we are convinced, can be decided otherwise than we have indicated; and notwithstanding the sympathy that is aroused for the injured child there is no ground upon which liability of the railroad company can be successfully asserted.

A lengthy and somewhat labored argument is made to be rid of the Act of May 6, 1907, as void, because prohibited by or in conflict with the State constitution. A sufficient answer is that the case was tried on the Act. The court in submitting the case read to the jury that part of Section 2 which we have quoted as fixing the measure of duty imposed by it and left to the jury to say whether that duty had been violated by the railroad company. There can be no doubt that the railroad company constructed the bridge under compulsion of the Act; the Act subjected it to penalties if it did not do so. The legislature exerted its police power over the railroad company and its creature and agent, the city.

[5] The particular constitutional provisions that are said to render the Act void are these:

"Every person is entitled to a certain remedy under the laws for all injuries or damages he may have received in his person, property or character. —The General Assembly shall not grant to any citizen or class of citizens privileges or immunities which on the same terms shall not equally belong to all citizens.—The right of property is above and higher than any constitutional sanction.—The General Assembly shall not pass any local or special law vacating roads, streets or alleys.—Nor shall the operation of any general law be suspended by the legislature for the benefit of any particular individual, corporation or association.—The General Assembly shall pass no special act conferring corporate powers except for charitable, educational, penal or reformatory purposes, where the corporations are to be and remain under the patronage of the state.—The General Assembly shall provide by general laws for the organization of cities (which may be classified) and incorporated towns.—No municipal corporation shall be authorized to pass any laws contrary to the general laws of the state.—No county, city, town or municipal corporation shall become a stockholder in any company, association or corporation; or obtain or appropriate money for or loan its credit to any corporation, association, institution or individual.—All railroads which are now or may be hereafter built and operated, in whole or in part, in this State shall be responsible for all damages to person and property under such regulations as may be prescribed by the General Assembly."

[6] We think little need be said. The Act did not vacate a road or street. The viaduct had no other effect than to raise the traveled surface of the street. There was no suspension by the Act of the operation of any general laws of the State, for there was no general law of the State which required the construction of viaducts at all places of like character. There was a general law requiring railroad compa-

nies, where their railroads crossed public roads or highways, to maintain the intersection and approaches of the highway at certain relative elevations and grades, and it also permitted, but did not require, the railroads to construct bridges at said crossings. This viaduct was provided for in a special Act, and the legislature, under its police power, had in mind the special facts and circumstances at this particular place, unlike the conditions prevailing at the usual crossing of a railroad and a highway. The rule applicable is stated with clearness by this court in Harris v. Bell, 250 Fed. 209, 216, 162 C. C. A. 345, 352, thus:

"Specific legislation in relation to a particular class or subject is not affected by general legislation in regard to many classes or subjects, of which that covered by the specific legislation is one, unless it clearly appears that the general legislation is so repugnant to the special legislation that the legislators must be presumed to have intended thereby to modify or repeal it; but the special and the general legislation must stand together, the former as the law of the particular class or subject, and the latter as the general law upon other subjects or classes within its terms."

The argument that the special Act is void is without weight or persuasive force.

The judgment must be reversed and the case remanded.

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes