STERNBERG v. DRAINAGE DIST. NO. 17 OF MISSISSIPPI COUNTY, ARK.

No. 8690.

Circuit Court of Appeals, Eighth Circuit.

Oct. 7, 1930.

Cooley & Adams, of Jonesboro, Ark., and Allen Hughes, of Memphis, Tenn., for appellant.

Zal B. Harrison, and Leon Smith, both of Blytheville, Ark., and Walter G. Riddick and Charles T. Coleman, both of Little Rock, Ark., for appellee.

Before VAN VALKENBURGH and GARDNER, Circuit Judges, and MUNGER, District Judge.

GARDNER, Circuit Judge.

This is an action to recover damages for a breach of contract. It is alleged in the complaint that the defendant is a drainage district, and that as a part of the work of the improvement of such district plaintiff was awarded a contract for the digging of a ditch described in the contract and the plans and specifications forming a part thereof; that he began work in connection with the improvement and continued to work thereon pursuant to his contract until the 1st day of May, 1921, at which time he was informed by the commissioners of the defendant district that no funds were available with which to compensate him. That by reason of defendant's failure to pay plaintiff's estimates as provided in the contract, he was forced to suspend operations from the 16th of May, 1921, until the 12th of December, 1921. That the defendant was fully advised that its failure to pay said moneys as provided in the contract would result in a forced suspension of

plaintiff's operations. That during and by reason of the suspension of operations, plaintiff incurred losses, to his damage in the sum of $25,094.97. Apparently, a paragraph of the complaint, which is not reflected in this record, charged that the plaintiff had performed extra work, for which he was entitled to compensation, and the judgment of the lower court awarded him compensation for such extra work, in the sum of $1,362.52, and from this part of the judgment no appeal is taken, and, hence, the pleading upon which it is based has not been printed in the record.

The answer, after admitting certain formal jurisdictional allegations in the complaint, and that plaintiff was awarded the contract as pleaded, denies that plaintiff was forced to suspend his operations as alleged, admits that the district was forced to suspend cash payments in May, 1921, on account of its inability to dispose of its bonds, but alleges that, when this occurred, the plaintiff, together with other contractors similarly situated, made and entered into a contract with the defendant by which they agreed to continue the work under their respective contracts and to accept payment therefor in the manner specified in this contract, and that plaintiff continued under the collateral contract, was paid all sums due him, together with interest, which payments were accepted by him in full payment.

After issue joined, the parties, by written stipulation signed by their attorneys, waived a jury and agreed to submit the issue of fact to the court. Thereafter, on November 24, 1926, and before the trial of the issues, the plaintiff filed a motion to transfer the cause to the equity side of the docket, and this motion, by written indorsement thereon signed by attorneys for defendant, was confessed, and pursuant thereto the lower court entered its order transferring the cause to the equity docket and appointed a special master to make findings and report same to the court. The cause was heard before the special master, who made report, and, upon exceptions filed thereto, the lower court sustained the exceptions of the defendant as to all claims for damages for breach of the contract, but entered judgment in favor of the plaintiff for $1,362.55 on account of the extra work performed by the plaintiff.

No appeal has been taken by the defendant, and on plaintiff's appeal it is urged that the court erred in denying plaintiff's claim for damages for delay, and in finding that the agreement made October 18, 1921, between the contractors, of whom plaintiff was one, and the drainage district, was a waiver of plaintiff's right to recover damages on account of the delay. No question was raised in the lower court as to the propriety of the trial of said action as an equity suit, nor is any such question raised here by either of the parties.

The drainage district had embarked on a large project and had let a number of contracts covering different portions of the drainage project, the total estimated cost of which ran into millions of dollars. To secure the necessary funds the district had floated a large bond issue, but the cost of the project, as frequently occurs, was much greater than had been anticipated, and the funds raised by the bond issue were inadequate. The district was indebted in large sums for work already performed. A great many contracts were still uncompleted, the drainage system unfinished, and the district was without funds. By the terms of the plaintiff's contract, and, apparently, those of the other contractors, the defendant was required to make monthly payments on engineers' estimates as the work progressed, but the district, being without funds, was unable to make these payments, in consequence of which the plaintiff, and the other contractors as well, suspended work about May 16, 1921. The district had no means of raising funds, except by the sale of bonds, and it had exhausted its credit and was unable to sell additional bonds. The operations under the various contracts being at a standstill, the contractors, cooperating with the commissioners of the defendant and representatives of certain bond houses and prospective bond purchasers, investigated the affairs of the district, and, finding that its outstanding indebtedness and the necessary expenses to complete the improvements would only justify a bond issue in a certain amount, which it seemed was probably insufficient to pay the contractors for the work already done and to complete the project, the prospective bond purchasers declined to buy the proposed bonds. The contractors, including plaintiff, then submitted to the board of commissioners of the district a written proposition dated October 18, 1921, which reads as follows:

"Blytheville, Arkansas, October 18, 1921.

"Drainage District No. 17, Mississippi County, Arkansas, Blytheville, Arkansas.

"We, the Committee of Contractors, will make the following offer to arrive at a settlement and continue with the work in your district:

"The District to pay cash in full for all work performed and accounts due the contractors, which to date have not been paid in cash.

"Payments to be made as follows:

"50% on or about November 8, 1921;

"25% on or about November 30, 1921;

"25% on or about December 30, 1921.

"Contractors will accept payment, in cash, for the remainder of the work which they now have under contract on the basis of 95% of the total amount, providing the remaining 5% be set up as a reserve fund, and if, at the completion of the work now under contract, it is found that sufficient amount of cash is on hand to pay the contractors the 5% retained, with interest at (6%) six per cent, such retained percentage and interest on same shall then be paid; or any part of the 5% that may be on hand at completion of the work now under contract will be paid.

"This offer is made on condition that the contractors committee and Engineers Elliott and Harmon and O. M. Fairley and the Board go over latest Engineers' report and determine if the 5% so retained, or any part thereof, may be available when said work is completed, and further to ascertain if any saving can be made by modifying work which will not be injurious to the District's plan of drainage.

"It is to be strictly understood that any agreement entered into on the basis herein mentioned shall in no way invalidate the original contract.

"(S) Otto Kochtitzky
"H. J. Sternberg
"C. F. Adams
"C. C. Hawley
"Wm. Crumpecker."

This proposal on behalf of the contractors was accepted by the defendant, and, with this settlement of the pending breached contracts, the board was able to sell additional bonds, and, from the proceeds of the bond sales, all the contractors were paid the amounts due for work already performed. All the contractors resumed work, completed their contracts, and were paid in compliance with this agreement. The plaintiff received for work already performed $58,770.04, which included the amounts then due him for work done under three other contracts, as well as the amount due for work already performed under the contract involved in this suit. He completed his work in June, 1924, and on its completion was furnished a final estimate showing the entire amount earned at the contract price, the payments which had been made to him, and the balance due, and he was given a voucher for the amount of this balance. This voucher was marked "final" and was cashed by him immediately upon its receipt.

It is the claim of the plaintiff that he is entitled to recover damages suffered by him by reason of the failure of the defendant to pay the monthly estimates when due under the original contract. While on the other hand, it is the claim of the defendant that the supplemental contract of October 18, 1921, which was performed by both the parties, constituted a composition of all the differences between the parties in the nature of an accord and satisfaction. The trial court so held and entered judgment dismissing plaintiff's complaint.

■ It is first to be observed that the instrument forming the basis of this controversy was prepared by the contractors and presented to the commissioners of the defendant. If the contract is ambiguous, the plaintiff is responsible for its ambiguity, and, under such circumstances, the contract should be construed most strongly against the party preparing it. Phoenix Insurance Co. v. Slaughter, 12 Wall. 404, 20 L. Ed. 444; Bijur Motor Lighting Co. v. Eclipse Machine Co. (D. C.) 237 F. 89; Caldwell v. Twin Falls Salmon River Land Co. (D. C.) 225 F. 584; Christian v. First Nat. Bank (C. C. A.) 155 F. 705; Van Zandt v. Hanover Nat. Bank (C. C. A.) 149 F. 127; Minton v. F. G. Smith Piano Co., 36 App. D. C. 137, 33 L. R. A. (N. S.) 305.

■ In considering the terms of this contract, the purpose which the parties sought to accomplish must be borne in mind, and, in arriving at their intention, recourse must be had to the circumstances surrounding them at the time the contract was entered into. It is the duty of the court to place itself, as nearly as may be, in the situation of the parties at the time, so as to view the circumstances as they were viewed by them. As said by Judge Sanborn, speaking for this court, in Leschen & Sons Rope Co. v. Mayflower Gold Mining & Reduction Co., 173 F. 855, 857, 35 L. R. A. (N. S.) 1: "The purpose of all interpretation is to ascertain and to give effect to the intentions of the parties expressed by their writings. The basic rule for the discovery of those intentions is that the court, so far as possible, should put itself in the place of the parties to the contract when their minds met upon the terms of the agreement, and then, from a consideration of the writing itself, of its purpose, and of the circumstanc-

es which conditioned its making, endeavor to ascertain what they intended to agree to, upon what sense and meaning of the terms they used their minds actually met. American Bonding Co. v. Pueblo Investment Co., 150 F. 17, 27, 80 C. C. A. 97, 107, 9 L. R. A. (N. S.) 557 [10 Ann. Cas. 357]; Accumulator Co. v. Dubuque St. Ry. Co., 64 F. 70, 74, 12 C. C. A. 37, 41, 42; Salt Lake City v. Smith, 104 F. 457, 462, 43 C. C. A. 637, 643; Fitzgerald v. First National Bank, 114 F. 474, 482, 52 C. C. A. 276, 284." See, also, Lowrey v. Hawaii, 206 U. S. 206, 27 S. Ct. 622, 51 L. Ed. 1026; Van Syckel v. Arsuaga, 231 U. S. 601, 34 S. Ct. 263, 58 L. Ed. 393; Ferguson v. Omaha, etc., Ry. Co. (C. C. A.) 227 F. 513.

■ At the time this contract was entered into the district was without funds, the contractors were unable to finance themselves and had suspended work. The only apparent remedy possible was the issuance of additional bonds, and representatives of bonding houses, under the circumstances existing, declined to purchase such bonds. The contractors had, prior to the time of submitting this offer, been subjected to delays, had suffered damages, and with the plaintiff had a right to treat the contracts as breached and to sue for damages. Under these circumstances and in this dilemma, the contractors proposed a settlement. The written proposal was to the effect that the contractors would "make the following offer to arrive at a settlement and continue with the work in your district. The district to pay cash in full for all work performed and accounts due the contractors which to date have not been paid in cash." This in effect was a proposal on the part of the contractors to accept cash in full of all work performed and accounts due, and this, read in the light of the facts and circumstances as they then existed, included every demand that the contractors had against the district at the date of the settlement. In fact, at that time, the claim for damages was one of the things to be settled. No proposition for refinancing could have been successfully carried out had not such a settlement, including settlement for damages, been effected, and it is apparent that it was so understood so far as the district and the representatives of the bonding houses were concerned. Neither the plaintiff, nor the other contractors, during these negotiations, made any suggestion that they had claims for damages not covered by the settlement, and it is apparent that such a claim asserted at that time on behalf of these contractors would have frustrated all efforts to settle, and the circumstances clearly indicate that it was the intention of the parties to settle not simply certain of the district's obligations to the contractors, but all obligations and liabilities arising out of this project. Not only were the contractors then making no claim for damages on account of the breach of their contracts, but they were conditionally offering to reduce the contract price of the work yet to be performed 5 per cent. They were waiving some rights which they had under the contracts and were offering to take a loss, as the only means of inducing the bond purchasers to take the bonds, and it seems reasonable to conclude that a part of this loss was the damage from delay.

It is, however, contended that the last clause of this contract, to wit, "It is strictly understood that any agreement entered into on the basis herein mentioned, shall in no way invalidate the original contract," indicates an intention to preserve the claim for damages for breach of the contract. We cannot agree with this contention. Confessedly, this supplemental contract modified to some extent the original contract, and there was good reason for making it clear that the original contract was to remain in effect as modified by the supplemental contract. The work on the project was to continue under the original contract as so modified, and it was the original contract only which contained a description of the work to be done, the plans, specifications, and all details as to engineering, supervision, and what not.

■ It is to be observed too that voucher for the final estimate was marked "Final." Both the estimate and the voucher were so marked. In this form they were tendered by the district to the plaintiff, who accepted them, indorsed and cashed the voucher. This conduct on the part of the plaintiff indicates, with other facts and circumstances, the construction which the parties themselves were placing upon the contract of October 18, 1921. The practical construction given to this contract by the parties as indicated by all the facts and surrounding circumstances is entitled to great, if not controlling, weight in determining its proper interpretation. Lowrey v. Hawaii, 206 U. S. 206, 27 S. Ct. 622, 51 L. Ed. 1026; Barber Asphalt Pav. Co. v. St. Paul (C. C. A.) 224 F. 842; Fitzgerald v. First Nat. Bank (C. C. A.) 114 F. 474; Bunday v. Huntington (C. C. A.) 224 F. 847.

It is true, as noted by counsel for plaintiff, that, while plaintiff signed the indorsement on the voucher and cashed and kept the proceeds arising therefrom, he wrote a letter stating

that he did not understand that the printed matter on the check had any reference to pending claims. This, apparently, was the first suggestion that there were any unsettled pending claims after acceptance and performance of the contract. In Cunningham v. Rauch-Darragh Grain Co., 98 Ark. 269, 135 S. W. 831, it is said: "The plaintiff could only accept the money as it was offered, which was in satisfaction of his demand. He could not accept the benefit and reject the condition."

In the Cunningham Case the check was marked: "In final settlement," and the party receiving the check wrote to the maker as follows: "Your check for $250.73 received and applied to your credit. We wish to advise, however, that we do not accept same as settlement, as there are a number of items that we will not agree to. We will check your statement within the next few days and advise you concerning same." Notwithstanding this protest, the court held that the cashing of the check constituted a contract of accord and satisfaction and barred recovery.

In the instant case we need not go so far as to hold that the indorsement and cashing of this check constituted in itself, standing alone, an accord and satisfaction, but it is a significant additional fact and circumstance showing the interpretation which the parties placed upon the contract. This construction, in view of all the surrounding facts and circumstances, is reasonable and equitable, and it would be unfair to permit plaintiff, who remained silent when the contract was accepted and acted upon by all the parties, now to assert that his claim for damages was not included in the settlement effected thereby.

We are therefore of the view that the lower court correctly construed the contract, and its judgment should be, and is, affirmed.